

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-26-2004

# Bensel v. Allied Pilots Assn

Precedential or Non-Precedential: Precedential

Docket No. 03-3176

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Bensel v. Allied Pilots Assn" (2004). *2004 Decisions.* Paper 162.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/162

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

———————

No. 03-3176

———————

LEROY BENSEL, individually and
as representative of a class consisting
of former Trans World Airlines, Inc.,
pilots employed by TWA Airlines LLC
as of April 2001,
Appellant

v.

ALLIED PILOTS ASSOCIATION;
TWA AIRLINES, LLC;
AIR LINE PILOTS ASSOCIATION;
AMERICAN AIRLINES, INC.

———————

On Appeal From the United States
District Court for the District
of New Jersey
(D.C. Civil No. 02-cv-02917)
District Judge: Hon. Joseph E. Irenas

———————

Argued July 12, 2004

BEFORE: RENDELL, FISHER and
VAN ANTWERPEN, Circuit Judges

(Filed October 26, 2004)

Jerald R. Cureton, Esq. (Argued)
H. Thomas Hunt, III, Esq.
Anthony Valenti, Esq.
Tara Ann Mosier, Esq.
Cureton Caplan
950B Chester Avenue
Delran, NJ 08075

        Counsel for Appellant

Steven K. Hoffman, Esq. (Argued)
Edgar N. James, Esq.
James & Hoffman
1101 17th Street, N.W.
Suite 510
Washington, DC 20036

James Katz, Esq.
Jennings Sigmond
1040 North Kings Highway
Suite 300
Cherry Hill, NJ 08034

        Counsel for Appellee Allied
        Pilots Association

Donald L. Havermann, Esq. (Argued)
Harry Rissetto, Esq.
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004

Alfred J. Lechner, Jr., Esq.
Joseph A. Piesco, Jr., Esq.
Morgan, Lewis & Bockius
502 Carnegie Center
Princeton, NJ 08540

        Counsel for Appellees
        TWA Airlines, LLC and
        American Airlines, Inc.

Daniel M. Katz, Esq. (Argued)
Katz & Ranzman
1015 18th Street, N.W.
Suite 801
Washington, DC 20036

       Counsel for Appellee Air
       Line Pilots Association

------

## OPINION OF THE COURT
_____

VAN ANTWERPEN, Circuit Judge

In this appeal of summary judgment, Appellants challenge the order of the District Court which granted summary judgment as to all Defendants-Appellees and dismissed all counts of Appellants' Second Amended Restated Complaint. Plaintiffs-Appellants (the "Class") are a group of airline pilots formerly employed by Trans World Airlines, Inc. ("TWA"). The gravamen of the Class' complaints, which arise under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 et seq., concern the imposition of a seniority integration agreement resulting from American Airlines, Inc.'s ("American") purchase of TWA's assets and the hiring of the Class by American's subsidiary, TWA Airlines, LLC ("TWA-LLC"). For the reasons explicated below, we reverse-in-part and affirm-in-part the Order of the District Court, and remand to provide the Class and the Air Line Pilots Association ("ALPA") an opportunity to conduct discovery on the claims asserted in Count I of the Second Amended Restated Complaint.

## I. Facts

As the material facts are generally not in dispute, the facts presented below are taken in large part verbatim from the District Court's opinion in this case. Additional facts are incorporated from the parties' submissions and appendices.

*The Asset Purchase Agreement*

After several years of failing to make a profit, on January 9, 2001, TWA entered into an agreement with Defendant-Appellee American whereby American agreed to purchase the majority of TWA's assets following TWA's filing for Chapter 11 bankruptcy protection. TWA made such a filing the following day, January 10, 2001. As a condition of the purchase agreement, American agreed to hire almost all of TWA's unionized employees provided that certain labor protective provisions in their various contracts were eliminated.

One of those provisions concerned the right of TWA's pilots to bring to arbitration issues of seniority integration in the event of a purchase of TWA or merger of TWA with another airline. American indicated that it would not proceed with its purchase of TWA unless this labor protective provision, known as Allegheny-Mohawk rights, was eliminated. TWA's pilots were represented by Defendant-Appellee ALPA through its TWA Master

Executive Council ("TWA MEC") unit.[1] Under American's collective bargaining agreement with its pilots, represented by Defendant-Appellee Allied Pilots Association ("APA"), the seniority of any new pilots who began working for American, as a result of an acquisition by American, would begin to accrue only at the moment that the pilots began working for American.

### The Waiver Agreement

The TWA MEC resisted waiving its seniority protection provisions, and on March 15, 2001, TWA filed a motion under 11 U.S.C. § 1113 with the Bankruptcy Court seeking to abrogate the provisions in its collective bargaining agreement with ALPA. In response, on April 2, 2001, the TWA MEC passed a resolution waiving its seniority protection provisions in exchange for a letter from American in which American promised to "use its reasonable best efforts" with APA to "secure a fair and equitable process for the integration of seniority" and to adopt the procedures that result from facilitated meetings between APA and ALPA. Significantly, any seniority integration agreement reached between APA and ALPA was to be presented to American as a proposed modification of the collective bargaining agreement between American and APA. On April 6, 2001, the Bankruptcy Court entered a stipulation and order withdrawing the section 1113 motion and formalizing the waiver agreement.[2]

### The ALPA / TWA-LLC Transition Agreement

On April 9, 2001, ALPA and the TWA MEC entered into a transition agreement with TWA-LLC. Upon completion of the asset purchase by American, TWA-LLC would become a wholly owned subsidiary of American. Under that transition agreement, the majority of the provisions of the collective bargaining agreement between ALPA and TWA would remain in effect until such time as the National Mediation Board ("NMB") adjudicated TWA-LLC and American as a "single carrier" and extended APA's certification to cover the TWA-LLC pilots (comprising the Class). The transition agreement incorporated by reference American's promise to use its reasonable best efforts to ensure a fair seniority integration process. In addition, ALPA would continue to remain the exclusive representative of the TWA-LLC pilots until the NMB made the appropriate declarations. The next day, on April 10, 2001, American's purchase of TWA's

---

[1] Some members of the class of Plaintiffs in this case were also members of the TWA MEC.

[2] There is a great deal of uncertainty as to what the result might have been if American had gone through with its purchase of the TWA assets without ALPA waiving its seniority integration protections. Of course, it was precisely this uncertainty that most likely influenced American to request the waiver by ALPA.

3

assets was finalized and TWA-LLC began operations as a separate air carrier. At that point, almost all TWA pilots became employees of TWA-LLC.

*Seniority Integration Process*

Between at least February and August of 2001, the TWA MEC and APA negotiated with each other over seniority integration under the auspices of a facilitator provided by American. No agreement was reached between the parties. On November 8, 2001, APA and American reached an independent agreement on seniority integration of the former TWA pilots, known as Supplement CC. Under Supplement CC, some TWA pilots did receive credit for their seniority, and certain captains and first officer positions were guaranteed for former TWA pilots at the remaining pilot base for TWA-LLC pilots, in St. Louis, Missouri. Supplement CC was not to become effective until the NMB declared American and TWA-LLC to be a single carrier and extended the APA's certification. TWA MEC refused to sign Supplement CC.

*NMB Proceedings*

On November 9, 2001, APA filed a petition with the NMB seeking the declaration of "single carrier" status. ALPA opposed this petition, but on March 5, 2002, the NMB declared that TWA-LLC and American were a "single carrier" for RLA purposes. On April 3, 2002, after ALPA declined to submit an application to become the bargaining representative for the combined pilot group, and despite the objection to APA certification submitted by TWA MEC, the NMB certified APA as the sole bargaining agent for all American pilots. As a result, the April 9, 2001 TWA-LLC/ALPA transition agreement expired (by its own terms), ALPA's certification as the collective bargaining agent for the TWA-LLC pilots terminated, and Supplement CC became effective.

*Arbitration Proceedings*

Following execution of Supplement CC, ALPA pursued a grievance against American and arbitrated before a System Board of Adjustment, alleging that American violated the promise it made to ALPA in the letter it wrote concurrently with the April 2, 2001 waiver agreement. The grievance alleged that American did not use its "reasonable best efforts" to protect the TWA-LLC pilots' seniority protections, as it had agreed to do in its letter. Through the arbitration, ALPA sought the nullification of Supplement CC. The arbitrator, in a decision dated April 18, 2002, rejected the grievance and found for American.

*Summary of Relevant Dates*

For purposes of clarity, the dates mentioned in the foregoing discussion may be summarized as follows:

January 9, 2001:  TWA enters into Asset Purchase Agreement with American.

4

| | |
|---|---|
| April 2, 2001: | TWA MEC passes a resolution waiving its seniority protection provisions in exchange for American's "reasonable best efforts" promise. |
| April 9, 2001: | ALPA and TWA MEC enter into transition agreement with TWA-LLC. |
| April 10, 2001: | American's purchase of TWA's assets finalized; TWA-LLC begins operations as a separate air carrier. |
| November 8, 2001: | American and APA execute Supplement CC, an agreement governing the seniority integration of the former TWA pilots. Supplement CC is subject to two conditions subsequent. |
| March 5, 2002: | NMB declares that American and TWA-LLC are a "single carrier" for RLA purposes. |
| April 3, 2002: | NMB certifies APA as the sole bargaining agent for all pilots, making Supplement CC |
| | effective; transition agreement between TWA-LLC and ALPA expires. |
| April 18, 2002: | Arbitrator rejects ALPA's allegation that American did not use its "reasonable best efforts" to protect the TWA-LLC pilots' seniority integration, as promised in its letter. |
| September 3, 2002: | Class action initiated by former TWA pilots. |
| January 27, 2003: | Class files Second Amended Restated Complaint. |

*Procedural Posture*

On September 3, 2002, this class action was initiated by filing a complaint notwithstanding a prior action by APA. Pursuant to a series of consent orders agreed to by all parties, the parties were realigned in their present form. The Class filed a Second Amended Restated Complaint against the four Defendants on January 27, 2003. The District Court's order dismissing the original action preserved the original filing dates for statute of limitations purposes.

## II. Jurisdiction

Appellate jurisdiction is proper pursuant to 28 U.S.C. § 1291. The District

5

Court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1367.

## III. Standard of Review

All four Defendants filed motions to dismiss on all claims asserted against them. The District Court elected to treat these motions as summary judgment motions.[3]

This Court has plenary review of the District Court's decision to grant summary judgment. See Blair v. Scott Specialty Gases, 283 F.3d 595, 602-03 (3d Cir. 2002). We apply the same standard as used by the District Court. Id. A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

---

[3]Notwithstanding the District Court's characterization of Defendants' motions as motions for summary judgment, the District Court dismissed duty of representation claims asserted against ALPA for failure to state a claim. To the extent we treat ALPA's motion as a motion to dismiss, our review is plenary. Felice v. Sever, 985 F.2d 1221, 1226 (3d Cir.), cert. denied, 509 U.S. 923, 113 S.Ct. 3038 (1993). Plaintiffs-Appellants have noted in their brief that the District Court failed to address their Rule 56(b) affidavit and failed to grant a Rule 56(f) continuance. That issue, however, is not properly before us as Appellants did not base their appeal on that ruling.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In reviewing the grant of summary judgment, we must affirm if the record evidence submitted by the non-movant 'is merely colorable or is not significantly probative.'" See Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226, 232 (3d Cir. 2002).

Under this standard of review, if there is a material issue of fact about when the statute of limitations period began to accrue, then the District Court's granting of summary judgment was improper.

## IV. Analysis

### Count I

Count I of the Second Amended Restated Complaint asserts against ALPA a series of breaches of its duty of fair representation under the RLA. The District Court found these claims to be time-barred, or alternatively, that they failed to state claims upon which relief could be granted. As explained below, however, it follows from application of the rays of hope doctrine that Appellants' claims did not accrue until April 18, 2002, the date the arbitrator of the System Board of Adjustment denied Appellants' challenge to American's execution of its "best efforts" promise, or at the earliest, April 3, 2002, the date Supplement CC became effective. Because the Class filed its breach claims against ALPA within six months of both of these accrual dates, the claims were timely filed, and, if proven, state claims warranting relief. Accordingly, we reverse the District Court

and remand to permit the parties to proceed with discovery and provide the Class an opportunity to further explore its breach claims.

## A. Accrual of Claim

It is undisputed that the statute of limitations for a duty of fair representation claim against a union under the RLA is six months. Sisco v. Consolidated Rail Corp., 732 F.2d 1188, 1193-94 (3d Cir. 1984).

As a general matter, a duty of fair representation claim accrues and the six month limitations period commences when "the futility of further union appeals becomes apparent or should have become apparent." Scott v. Local 863, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 725 F.2d 226, 229 (3d Cir. 1984). If, however, a union purports to continue to represent an employee in pursuing relief, the employee's duty of fair representation claim against the union will not accrue so long as the union proffers "rays of hope" that the union can "remedy the cause of the employee's dissatisfaction." Childs v. Penn. Fed'n Brotherhood of Maintenance Way Employees, 831 F.2d 429, 434 (3d Cir. 1987); see also Whittle v. Local 641, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 56 F.3d 487, 490 (3d Cir. 1995); Miklavic v. USAir, Inc., 21 F.3d 551 (3d Cir. 1994); Vadino v. A. Valey Eng'rs, 903 F.2d 253, 261 n.11 (3d Cir. 1990). In this context, it is irrelevant if the employees were aware of or with reasonable diligence should have discovered the acts constituting the breach at any time before rays of hope were extinguished. See Childs, 831 F.2d at 436; Miklavic, 21 F.3d at 556.

Two significant policies underlie the view that, despite the employee's awareness of the union's breach or the futility of further union action, the statute of limitations does not accrue while the union continues to represent the employee and proffers rays of hope regarding the latter's claim. First,

> it is inefficient and unwise to compel an employee to sue his union in federal court while the union continues, in good faith, to pursue the employee's claims and attempts to remedy any past breach of its DFR. If the union can indeed remedy the cause of the employee's dissatisfaction, it should be allowed to do so, thus obviating the federal judicial involvement. Childs, 831 F.2d at 434. This policy is especially befitting in the context of labor disputes, where Congress has evidenced its desire to resolve disputes through arbitration. Id. Second, requiring an employee to sue the union within six months of discovering the union's breach puts the

7

employee in an untenable position because "if he waits to sue the union he may lose the right to do so, but if he sues the union immediately he may antagonize the best possible champion of his cause." Id. at 435.

## B. Application

Before applying the rays of hope doctrine to the instant scenario, we note that, contrary to the District Court's and ALPA's position, Supplement CC was not the inevitable outcome of the April 2001 waiver of Appellants' Allegheny-Mohawk provisions. In other words, despite waiving an important labor protective provision, rays of hope remained that, with appropriate continued representation by ALPA, a more propitious seniority agreement than Supplement CC could have been obtained for the Class. First, although concession of its Allegheny-Mohawk rights left the Class in an admittedly weak bargaining position, the Class received in exchange for its waiver American's promise to use its "reasonable best efforts" to ensure "a fair and equitable process for the integration of seniority." ALPA brought to arbitration the issue of whether American adhered to its best efforts promise. A favorable outcome could have resulted in the invalidation of Supplement CC. Second, ALPA submitted an opposition to APA's application to the NMB for a declaration of single carrier status, and ALPA, through the TWA MEC, requested that the NMB stay extension of APA's representational

certification pending an investigation into possible interference by American. Success in any of these endeavors would have prevented imposition of Supplement CC, as the single carrier determination and extension of certification were prerequisites to its enforcement. Third, had ALPA attempted to require American and TWA-LLC to negotiate with it the terms of the Class' seniority integration, or attempted to challenge certification of APA as the certified collective bargaining agent of the former TWA pilots as requested by the TWA MEC, or attempted to seek representational rights of the combined pilots before the NMB, or challenged Supplement CC directly, actions that ALPA failed to take in purported violation of its fair representation duty to the Class, a more favorable integration agreement could arguably have been implemented. Finally, because waiver of the contractual Allegheny-Mohawk provisions did not constitute a clear and unmistakable waiver of statutory bargaining rights under the RLA, compare Gullickson v. Southwest Airlines Pilots' Ass'n, 87 F.3d 1176 (10th Cir. 1996), Supplement CC was not the foregone conclusion of the Class' waiver. Rays of hope were not automatically extinguished by virtue of the Class' waiver of the Allegheny-Mohawk provisions. Indeed, Supplement CC itself did not endtail all of the former TWA pilots.

### 1. NMB Certification

Appellants argue that the statute of limitations began to run no sooner than April 3, 2002, when ALPA lost

8

representational rights and when Supplement CC became binding and effective.

This Court has applied the rays of hope analysis in the absence of any arbitration proceeding. Our discussion of the doctrine makes obvious that its supporting principles are not inherently dependent on the presence of an arbitration proceeding. An arbitration proceeding is merely illustrative of one way in which a union can proffer rays of hope that it will obtain the relief the complaining employee desires in spite of a breach of its duty of fair representation. We have also applied the rays of hope doctrine to a union's attempted renegotiation of the terms of a collective bargaining agreement with the employer on behalf of its members. Although the alleged breach of the duty of fair representation occurred during these negotiations, we found that the employees' potential cause of action against the union did not accrue until the union was decertified, for only then "were the rays of hope extinguished." Miklavic, 21 F.3d at 556.

Although Supplement CC was executed on November 8, 2001, it was an agreement subject to conditions subsequent-namely, that the NMB would render a single carrier determination and designate APA as the certified collective bargaining agent for all pilots. As stated earlier, ALPA and TWA MEC formerly opposed these determinations before the NMB. Had any of these conditions subsequent failed to transpire, the transition agreement between TWA-LLC and ALPA would have remained in effect at least until renegotiation with ALPA, and further bargaining on the issue of seniority negotiation would have occurred. Thus, rays of hope remained at least until these conditions subsequent were satisfied, rendering effective and binding Supplement CC, and ALPA lost representation rights as the Class' bargaining agent.

Rays of hope had to extend until at least April 3, 2002, when the NMB certified APA as the sole bargaining agent for all American pilots. As suit was filed on September 3, 2002, the action was timely. We do not rest solely upon the April 3, 2002 date because, as discussed below, we believe that rays of hope extended until April 18, 2002, when the adverse arbitration decision was rendered.

2. The Arbitration Proceeding

Where a union represents the employee in an arbitration proceeding and proffers rays of hope concerning the possibility of success in spite of its breach, this Court has held that the employee's cause of action does not accrue until the arbitration board denies the employee's claim. Childs, 831 F.2d at 436; Whittle, 56 F.3d at 490. Although forcing a plaintiff to delay pursuing a meritorious duty of fair representation claim during fruitless representation by the union until the arbitration or grievance board issues its final decision sacrifices the policy of avoiding futile administrative procedures, this Court has determined that this policy is outweighed by the important federal

9

policies of deference to arbitration, avoidance of unnecessary lawsuits and certainty as to when the statute of limitations commences. Childs, 831 F.2d at 436 n.3.

Pursuant to this approach, the Class' claims against ALPA accrued when the adverse arbitration decision was rendered on April 18, 2002. The instant action was filed on September 3, 2002, within six months of accrual.

In the instant case, ALPA pursued an arbitration against American on behalf of the former TWA pilots in an effort to establish that American did not fulfill its promise to use reasonable best efforts to ensure a fair seniority integration process. In instituting the grievance, ALPA sought to prevent enforcement of Supplement CC. Thus, a successful arbitral outcome would have remedied and/or rendered moot ALPA's supposed breaches. Had Supplement CC been invalidated, ALPA could have pressed American and TWA-LLC to bargain directly with it concerning a seniority integration agreement for the Class. Furthermore, Supplement CC's abrogation would have rendered moot Appellants' assertions that ALPA violated its duty of fair representation through its failure to seek representational rights of the combined pilot group before the NMB, its failure to challenge certification of APA as the certified collective bargaining agent of the former TWA pilots as requested of them by the TWA-MEC, and its failure to take action to challenge Supplement CC.

ALPA's attempt to distinguish Childs and Whittle on the basis that the breaches of the duty of fair representation asserted against the unions in those cases involved the unions' conduct *during* the grievance proceeding or arbitration proceeding is unpersuasive. Although both cases arise in that posture, the reasoning espoused in Childs and Whittle justify its application to situations where the union breach occurs outside the context of the arbitration proceeding itself. Indeed, the instant suit represents such an example. While the breaches asserted against ALPA are unrelated to its conduct during the arbitration, a favorable arbitral outcome would have remedied those breaches, as described above. As such, the polices supporting our reasoning in Childs and Whittle-- that unnecessary federal litigation should be avoided, that administrative procedures should be given "full play," and that an employee should be spared the "Hobson's choice between letting the statute of limitations run and antagonizing his best advocate" Childs, 831 F.2d at 436--are unquestionably furthered here. Moreover, it is significant that this Court has applied the rays of hope analysis in the absence of any arbitration proceeding in Miklavic. Therefore, we refuse to adopt such a narrow interpretation of this precedent when the policies founding them are undoubtedly furthered in circumstances that differ from those decisions' exact factual postures.

It is of no moment that the arbitration proceeding did not specifically challenge the April 2001 waiver agreement

10

and was unrelated to any supposed coercion of TWA MEC by ALPA to forfeit the Allegheny-Mohawk provisions in violation of its fair representation duty. We recognize that Appellants must have realized the general implications of waiving the Allegheny-Mohawk provisions at the time they agreed to do so. It may be true that ALPA's continued representation of the Class through arbitration could not have ameliorated the Class' weak bargaining position occasioned by that waiver. Rays of hope nonetheless apply to ALPA's alleged conduct in the context of forcing this waiver upon the Class. The Class could not have appreciated or predicted the full ramifications of this waiver until at the earliest when Supplement CC became effective and binding. Again, Supplement CC was not the waiver's inescapable result. Moreover, and perhaps more significantly, forcing the Class to challenge ALPA within six months of the waiver would have placed the Class in the untenable position of antagonizing the union that continued to represent them in an effort to acquire the most advantageous seniority integration possible. This concern represents a fundamental basis of the rays of hope doctrine. There are good reasons for having a statute of limitations, and we emphasize that the rays of hope doctrine is not open-ended. The fact pattern may vary from case to case, but clearly there comes a point when a union can no longer be said to proffer rays of hope to an employee, and the rays of hope are extinguished.

Accordingly, we hold that Appellants' breach of the duty of fair representation claims against ALPA did not accrue until April 18, 2002.

We briefly address and dispose of ALPA's position. ALPA posits that the six- month statute of limitations on a duty of fair representation claim challenging a collectively bargained agreement begins to run immediately upon execution of that agreement. Relying primarily on Local Lodge No. 1424 v. National Labor Relations Board, 326 U.S. 411, 415-417, 80 S.Ct. 822 (1960), ALPA asserts that this rule bars a legal challenge to both the April 2, 2001 waiver agreement that was subsequently memorialized in the Stipulation and Order of the Bankruptcy Court on April 6, 2001, and all the additional duty of fair representation breaches alleged in the Second Amended Restated Complaint which ALPA contends were the inevitable result of the initial waiver, because those claims accrued no later than April 6, 2001. Local Lodge is distinguishable in a very important respect. It rejected the premise that a collective bargaining agreement that contains a union security clause valid on its face, but which was entered into when the union did not have majority status, gives rise to two independent unfair labor practices, one being the execution of the agreement, the other arising from its continued enforcement. Instead, the Supreme Court held that

> [w]here . . . [a] collective bargaining agreement and its enforcement are both

11

perfectly lawful on the face of things, *and an unfair labor practice cannot be made out except by reliance on the fact of the agreement's original unlawful execution*, an event which, because of limitations, cannot itself be made the subject of an unfair labor practice complaint, . . . permitting resort to the principle that § 10(b) is not a rule of evidence, in order to convert what is otherwise legal into something illegal, would vitiate the policies underlying that section. 362 U.S. at 419 (emphasis added). This reasoning applies to bar Appellants' claims in the instant suit only if one accepts the proposition that the limitations period associated with ALPA's initial breach accrued on April 6, 2001, and the subsequent alleged breaches are all "inescapably grounded," 362 U.S. at 422, in the initial breach. Because Supplement CC was not the inevitable result of the waiver agreement, as described in connection with our "rays of hope" analysis, and because the subsequent fair representation

allegations constitute breaches independent of the initial waiver agreement, this argument is not compelling.

In any event, ALPA contends that any challenge brought regarding Supplement CC accrued no later than November 8, 2001, the date of its execution. Again, the cases relied upon by ALPA in support of this view are materially distinguishable. In each case, the union being sued was the union that entered into the challenged agreement. As such, the employees pressing duty of fair representation claims against the union were already *bound* by the agreement in issue at the time that agreement was either entered into or ratified. Those plaintiffs suffered a definitive injury upon the date of execution or ratification. See United Indep. Flight Officers v. United Air Lines, Inc., 756 F.2d 1262 (7th Cir. 1985) (initial injury occurred when the union failed to reach an agreement with employer and a subsequent injury occurred when the agreement was signed); Gvozdenovic v. United Air Lines, Inc., 933 F.2d 1100 (2d Cir.) (incoming flight attendants were already employed, members of the union, and thus bound as of the date offending agreement was ratified), cert. denied, 502 U.S. 910, 112 S.Ct. 305, 116 L.Ed.2d 248 (1991). Significantly, Gvozdenovic found that the statute of limitations ran *not* from when the agreement was entered into, but from when it was ratified (and presumably effective). 933 F.2d at 1106. In contrast, although Supplement CC was executed on

November 8, 2001, it did not purport to bind the Class until its conditions subsequent were satisfied. This occurred on April 3, 2002, when the NMB certified APA as the bargaining representative for the Class. Indeed, the actions that the Class asserts ALPA failed to pursue in violation of its duty of fair representation may have invalidated Supplement CC or prevented its application to the Class.

### 3. Relation Back

Given our determination that the Class' claims against ALPA accrued on April 18, 2002, Appellants' claims are timely filed. Appellants initiated a class action against ALPA on September 3, 2002, within the prescribed six-month limitations period. ALPA counters that, with the sole exception of allegedly coercing the Class into waiving the Allegheny-Mohawk provisions, the additional purported breaches of its fair representation duty are time-barred nonetheless because they were not alleged until the Class's Second Amended Restated Complaint, filed on January 27, 2003. This is approximately nine months following accrual of the Class's breach claims. As explained below, ALPA's argument is unavailing because the breach claims specifically enumerated in the Second Amended Restated Complaint relate back to Appellants' original Complaint pursuant to Fed. R. Civ. P. 15(c)(2).

Fed. R. Civ. P. 15(c) provides:

(c)    Relation Back of Amendments.    An amendment of a pleading relates back to the date of the original pleading when

. . . .

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.In accordance with the general theory of liberalized pleading in the federal system, Rule 15(c) is premised on the notion that a party is not entitled to the protection of the statute of limitations based upon the later assertion by amendment of a claim or defense that arises out of the same conduct, transaction, or occurrence set forth in the timely filed original pleading. 6A Wright, Miller & Kane, Federal Practice & Procedure § 1496 (2d ed. 1990). Thus, amendments that restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct, transaction or occurrence in the preceding pleading fall within Rule 15(c). See, e.g., Clipper Exxpress v. Rocky Mt.

Motor Tariff Bureau, Inc., 690 F.2d 1240, 1259 n.29 (9th Cir.), cert. denied, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1982). In essence, application of Rule 15(c) involves a search for a common core of operative facts in the two pleadings. As such, the court looks to whether the opposing party has had fair notice of the general fact situation and legal theory upon which the amending party proceeds. See, e.g., Michelsen v. Penney, 135 F.2d 409, 416-17 (2d Cir. 1943) ("[T]he original complaint clearly gave defendant notice that he would be held for all acts of negligence. . . . [D]efendant was bound to realize that he would be held for every possible act of mismanagement."). It is clear that the Class' Second Amended Restated Complaint merely expounds upon and further details the factual scenario and breach claims that were roughly sketched in its original Complaint. The original Complaint outlines in broad terms the events surrounding the Asset Purchase Agreement, the waiver agreement, the best efforts promise, the facilitated discussions between ALPA and APA, the arbitration proceeding brought by ALPA, and the negotiation and implementation of Supplement CC. The Class' breach allegations focus on ALPA's coercive role in forcing the Class to waive its labor protective provisions, but further charge ALPA with breach generally. These allegations are painted with a broad brush, and can easily be read to encompass the more particularized claims that appear in the Second Amended Restated Complaint. For example, the original Complaint broadly avers that Appellants' claims stem from ALPA's actions in causing the class to lose its seniority rights. By virtue of the series of events drafted in the original Complaint, ALPA was unquestionably on notice that it would be held liable for every possible breach of its fair representation duty occasioned by the outlined facts. The additional purported breaches particularized in the Second Amended Restated Complaint derive directly

14

from the factual circumstances adumbrated in the original Complaint. This conclusion is buttressed by the lack of any resulting disadvantage or prejudice to ALPA, who by virtue of the original Complaint was undoubtedly aware of general fact situation and legal theory upon which the Class sought to hold it liable.

The breach claims which the Class asserted by amendment arose out of the same "conduct, transaction or occurrence set forth . . . in the original pleading," and therefore under Rule 15(c) of the Federal Rules of Civil Procedure the amendments relate back to the date of the original complaint. Consequently, Appellants' claims charging ALPA with breaches of its duty of fair representation are timely.

## C. Failure to State a Claim

The District Court alternatively dismissed four of Appellants' breach of the duty of fair representation claims for failure to state claims upon which relief can be granted. For the following reasons, we reverse.

The District Court treated together Appellants' allegations that ALPA breached its duty of fair representation by failing to seek representational rights of the combined pilot group before the NMB, and by failing to challenge certification of APA as the collective bargaining agent for the combined pilot group before the NMB.

In finding that these allegations failed to state a claim for relief, the District Court relied on Dycus v. NLRB, 615 F.2d 820 (9th Cir. 1980). The Ninth Circuit's opinion in Dycus, which involved a discharged employee's petition for review of an order of the NLRB dismissing an unfair labor practice complaint issued against two union locals, concurred with the Board's statement that "Local 598's withdrawal as bargaining agent did not constitute a breach of the duty of fair representation." Id. at 826 n.2. Dycus, however, does *not* stand for the proposition that a union's withdrawal as a bargaining agent *never* constitutes a breach of the duty of fair representation. The withdrawal must be done in good faith and for a proper purpose. "An exclusive bargaining agent may avoid its statutory duty to bargain on behalf of the unit it represents by unequivocally and in good faith disclaiming further interest in representing the unit. A disclaimer will not be given effect . . . if it is made for an improper purpose . . . ." Id. at 826 (internal citations omitted). Because Appellants aver that ALPA faced a conflict of interest in representing the former TWA pilots arising from an active organizing campaign to bring American pilots into ALPA with the knowledge and approval of APA, it is premature to dismiss these duty of fair representation claims at this time. If Appellants prove their allegations that ALPA failed to take specific actions on behalf of its members for an improper purpose or in bad faith, they may obtain relief for ALPA's breach of its fair representation duty.

15

Next, the District Court determined that ALPA's alleged failure to challenge Supplement CC following its approval on November 8, 2001 failed to state a claim for relief. Specifically, the District Court found there to be no duty of fair representation right of one union to challenge an agreement legally signed by another union and its employer. In other words, ALPA's decision not to file a futile challenge to Supplement CC cannot legally constitute a duty of fair representation breach. In Air Line Pilots Ass'n v. UAL Corp., 874 F.2d 439 (7th Cir. 1989), United's pilots, represented by ALPA, brought a suit against United and United's machinists union, complaining that United entered into a collective bargaining agreement with the machinists' union to change the pilots' terms of employment without bargaining over the change with the pilots. The Seventh Circuit held that the particular disputed provision in United's collective agreement with the machinists' union violated the Railway Labor Act. ALPA attempts to distinguish this case by noting that it did not involve an airline merger, and more importantly, that it did not address the issue of whether a carrier–American or TWA-LLC–must bargain with a union–in this case ALPA–that does not represent any of its employees. It is undisputed that in UAL Corp., the machinists and pilots were all employees of United. This latter distinction, however, ignores the fact that Appellants became employees of TWA-LLC as of April 9, 2001, and TWA-LLC continued to exist as a wholly owned subsidiary of American. Supplement CC

was not executed until November 8, 2001. As such, ALPA had the right under the RLA to negotiate with at least TWA-LLC until March 5, 2002, when the NMB rendered its single carrier determination, and thereafter with American until ALPA's representational rights were extinguished on April 3, 2002. Appellants thus state a viable claim.

For the foregoing reasons, we reverse the District Court's opinion on Count I of the Second Amended Restated Complaint and remand to permit the parties to engage in discovery. It is our belief that at this stage of the proceedings Plaintiffs should be given a fuller opportunity for discovery relating to Count I and permitted to ascertain if there is any factual support for their claims. At this point we ask "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), overruled on other grounds, Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It may be that ALPA properly carried out its duty of fair representation and there was nothing ALPA could realistically accomplish under difficult circumstances. But it is too early to decide this issue at this point.

*Count II*

A. Alleged Breaches of the Duty of Fair Representation by APA Prior to April 3, 2002

Count II of the Second Amended Restated Complaint asserts against APA a

number of purported breaches of the duty of fair representation committed prior to April 3, 2002. The District Court found that the APA owed no duty of fair representation to the Class prior to April 3, 2002, and accordingly dismissed these claims. We agree with the District Court and affirm for the following reasons.

A union has the statutory duty to represent all members of the appropriate bargaining unit fairly. See Humphrey v. Moore, 375 U.S. 335, 342, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). The scope of the duty of fair representation is commensurate with the scope of the union's statutory authority as the exclusive bargaining agent. Accordingly, a member of the bargaining unit has a cause of action against the union for breach of that duty. Vaca v. Sipes, 386 U.S. 171, 186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Conversely, the union's statutory duty of fair representation does not extend to those persons who are not members of the pertinent bargaining unit. Allied Chem. & Allied Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 181 n.20, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) (holding that because retirees are no longer members of the bargaining unit, the union has no duty to represent them in negotiations with the employer). In other words, exclusive representation is a necessary prerequisite to the statutory duty to represent fairly. Sipes, 386 U.S. at 177.

Recognizing the general principle that a labor union's statutory duty of fair representation extends only to the bargaining unit it exclusively represents,

Appellants argue that when two employee groups are combined, the duty of fair representation arises from the inclusion or impending inclusion within the bargaining unit that the integration process seeks to create. The cases relied upon by Appellants, however, do not support this contention. With one exception that is not applicable in the present case, none of the cases cited by the Class stand for the proposition that a union's duty to a group of employees may attach before those employees formerly enter the pertinent bargaining unit. Instead, as explained below, the finding in each of these cases that the relevant union's purported unlawful actions implicated a duty of fair representation occurred in the context of plaintiffs-employees who were members of the pertinent bargaining unit at the time the union took the allegedly unlawful actions.

In Brotherhood of R.R. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952), the case illustrating the "exception" alluded to above, the Supreme Court held that a union may not use the powers accorded it under the law for the purposes of racial discrimination against employees who are not members of the bargaining unit represented by the union. The Supreme Court emphasized the narrowness and limited reach of this opinion in Allied Chemical: "But whatever its theory, [Howard] does not require a union affirmatively to represent non-bargaining unit members or to take into account their interests in making bona fide economic decisions on behalf of those

17

whom it does represent." 404 U.S. at 181 n.20. Indeed, <u>Allied Chemical</u> unequivocally held that the bargaining agent is under no statutory duty to represent those not members of the bargaining unit in negotiations with the employer. <u>Id.</u> <u>Jones v. Trans World Airlines, Inc.</u>, 495 F.2d 790 (2d Cir. 1974), involved two separate classes of Trans World Airlines employees--guards and passenger relations agents--who performed many of the same functions. 495 F.2d at 793-94. Only the guards were represented by a union. <u>Id.</u> Relying on findings that the union "insist[ed] that the passenger relations agent jobs were in the guard unit" and that the passenger relations agents "had performed guard duties all along," the court held that the passenger relations agents were de facto members of the guard bargaining unit. <u>Id.</u> at 797. The Second Circuit thus concluded that the union breached its duty of fair representation by discriminating against the passenger relations agents based on their non-union status. <u>Id.</u> at 798. This Circuit has characterized <u>Jones</u> as "stand[ing] for the limited and undisputed proposition that discrimination against non-member employees *who are part of the bargaining unit* is impermissibly arbitrary if no relevant distinctions exist between the union and non-union employees." <u>Deboles v. Trans World Airlines, Inc.</u>, 552 F.2d 1005 (3d Cir. 1977) (emphasis added). Similarly, in <u>Gvozdenovic v. United Air Lines, Inc.</u>, 933 F.2d 1100 (2d Cir.), <u>cert. denied</u>, 502 U.S. 910, 112 S.Ct. 305, 116 L.Ed.2d 248 (1991), "as of the date" the AFA [the union representing the incumbent flight attendants at United] "ratified the allegedly violative [seniority] agreement," "the 1,202 incoming flight attendants [from Pan American] already had been working for United," were already members of the AFA, and thus were part of the United bargaining unit to which the AFA owed the duty of fair representation. 933 F.2d at 1106. <u>Bernard v. Air Line Pilots Ass'n</u>, 873 F.2d 213 (9th Cir. 1989) concerned the merger of Jet America and Alaska Airlines. Prior to the merger, Alaska pilots were represented by ALPA, while Jet America pilots were unrepresented. Alaska Air Group, the acquiring corporate parent of Alaska Airlines, operated Jet America and Alaska separately for several months, then announced it would merge the carriers. ALPA negotiated with Alaska regarding integration of the Jet America pilots with the Alaska pilots for purposes of seniority. Despite repeated requests, Jet America pilots were prohibited from partaking in the seniority discussions both prior to and following the effective date of merger on October 1, 1987. An agreement between ALPA and Alaska was not reached until October 6, 1987. In affirming the district court's finding that ALPA breached of its duty of fair representation as to the Jet America pilots, the Ninth Circuit noted that there was no dispute that the non-union Jet America pilots had entered the Alaska pilots' bargaining unit prior to October 6, 1987, the date the agreement adversely affecting plaintiffs' seniority rights was reached between ALPA and Alaska. 873 F.2d at 216.

18

The parallels between this case and that confronting the Ninth Circuit in McNamara-Blad v. Ass'n of Professional Flight Attendants, 275 F.3d 1165 (9th Cir. 2002) are striking. In late 1998, American purchased 80% of Reno's outstanding shares and announced it would merge the operations of the two airlines. Prior to merger of the flight operations on August 31, 1999, APFA, the union representing American's flight attendants (the Reno flight attendants were represented by another union), reached a seniority integration agreement with American. This agreement endtailed all Reno flight attendants, and was implemented as of August 31, 1999. In affirming the district court's finding that, as a matter of law, the Reno flight attendants were not in the APFA's bargaining unit and thus that the APFA was not required to fairly represent them, the Ninth Circuit explained that "[t]he work-forces of the two merging carrier become a single bargaining unit only when the carriers become a 'single carrier' . . . American and Reno did not become a 'single carrier' for representational purposes until August 31, 1999, after the seniority agreement between the APFA and American was reached." 275 F.3d at 1170 (internal citations omitted). The analogies between McNamara-Blad and the instant case are obvious.

Contrary to the Class' assertion, the cases discussed above indicate that it is *actual* inclusion in the bargaining unit–not "impending" inclusion–that triggers attachment of the duty of fair representation. To the extent Howard, as clarified by Allied Chemical is an exception to this rule, it not implicated here because the APA's decision to subordinate the seniority of most TWA-LLC pilots was a bona fide economic decision made to protect the interests of American's pilots, for whom APA did have a statutory duty to fairly represent. Before the NMB consolidated the TWA-LLC pilots into the American bargaining unit on April 3, 2002, when it certified APA as the exclusive bargaining agent, the pilots at American and the pilots at TWA-LLC belonged to different bargaining units, each with its own exclusive bargaining representative. It is only subsequent to April 3, 2002 that APA held a statutory duty to the Class.

This outcome is supported from a policy perspective. Appellants contend that following the reasoning espoused in McNamara-Blad will enable unions to conspire and time events in a manner designed to avoid duties of fair representation that would otherwise be owed to a group. In this case, had the Class become employed by American (as opposed to TWA-LLC) following closing of the merger, APA would most probably have been the exclusive bargaining agent for both the Class and American's pilots and would have owed a statutory duty to both groups in negotiating seniority. To avoid a statutory duty to fairly represent the Class, Appellants aver that APA and American created the fiction that the two groups of pilots were employed by different entities (American and TWA-

LLC) and that the Class was not part of the APA bargaining unit. This fiction enabled APA to unilaterally negotiate the Class' seniority with American without the Class' input. Appellants allege that Supplement CC was intentionally entered into by APA and American prior to APA's petition to extend its certification to cover the Class to avoid the consequences of Bernard. Nevertheless, we agree with APA that the Class' allegations that ALPA breached its duties and conspired with APA to deprive the Class of valuable rights does not justify imposition of a fair representation duty on APA prior to April 3, 2002.

Appellants' conspiracy concerns, while legitimate, run counter to an important competing policy articulated in McNamara-Blad. Adopting Appellants' position "would force unions to protect the interests of any person who might become a bargaining unit member to the detriment of current bargaining unit members. Such a duty would contravene the union's statutory duty to protect the interests of its own bargaining unit members." 275 F.3d at 1173. In light of the fact that Appellants do have a remedy against their former bargaining agent, ALPA, this observation outweighs Appellants' concerns regarding possible collusion and conspiracy.

Because we agree with the District Court that APA owed no duty of fair representation to the Class prior to April 3, 2002, we affirm.

B. Alleged Breaches of the Duty of Fair Representation by APA Post-April 3, 2002

Count II of the Second Amended Restated Complaint further asserts that APA breached its duty of fair representation to the Class after April 3, 2002 by failing to require American to maintain the status quo as to the Class' working conditions, including seniority. In lieu of maintaining the status quo, Appellants allege that Supplement CC was imposed without following the requisite section 6 procedures of the RLA, 45 U.S.C. § 156. The District Court dismissed the allegations for failure to state breaches of the duty of fair representation, either because the allegations are "too general in nature to specify any actual DFR breach" or because there was nothing for APA to negotiate on behalf of the Class once Supplement CC became effective. For the following reasons, we affirm.

The "status quo" provision of section 6 of the RLA directs that, while the major dispute resolution procedures are being followed, "rates of pay, rules or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by [the RLA]. . . ." 45 U.S.C. § 156; see also id. § 152, Seventh ("No carrier . . . shall change the rates of pay, rules, or working conditions of its employees . . . except in the manner prescribed in [collective bargaining] agreements or in section 156 of this title."). The purpose of the status quo provisions is to impose an obligation on the parties to make every reasonable effort to negotiate a settlement. The provisions promote compromise to avoid

strikes. See Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union, 396 U.S. 142, 148-49, 149 n.14, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). With respect to ascertaining what the appropriate status quo conditions are, the Supreme Court has counseled that "the status quo extends to those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement." Id. at 153. As such, it is of no moment if the relevant collective bargaining agreement upon which the dispute is based has expired. Because the status quo derives from the RLA, and not contract, that agreement can still be used to inform the court's status quo determination. "[T]he inquiry is not one which looks to the parties' collective bargaining agreements; instead, the act requires an objective determination of the actual status quo." Int'l Ass'n of Machinists and Aerospace Workers v. Aloha Airlines, Inc., 776 F.2d 812, 816 (9th Cir. 1985). Moreover, that the focus of the status quo inquiry is on "actual, objective working conditions" does not preclude the parties from entering into an explicit agreement defining the specific conditions that the parties want to constitute the status quo during the appropriate renegotiation period, even if such conditions differ from the actual, objective status quo. In other words, section 6 of the RLA does not prevent the parties from altering the actual, objective status quo by agreement. Airline Pilots Ass'n, Int'l v. Pan-Am. World Airways, Inc., 765 F.2d 377, 381 (2d Cir. 1985).

Appellants argue that the terms and conditions embodied in the TWA-LLC/ALPA transition agreement, which expired by its own terms on April 3, 2002 when the NMB extended APA's certification to cover the Class, constitute the status quo and should have continued in full force until the APA negotiated new terms with American, with the exception of those limited terms which the parties had previously agreed would change. The transition agreement does not provide that the Class would be bound to any agreement entered into between American and APA upon determination of single carrier status and the transition agreement's expiration.

We agree that the Class never waived its statutory rights under the RLA. Section 6 of the RLA is not implicated, however, because imposition of Supplement CC upon on the Class on April 3, 2002 did not constitute a change in the Class' status quo. The facilitation agreement, signed by ALPA, APA, TWA-LLC and American, provides that, "in the event that APA and ALPA reach an agreement on an integrated seniority list . . . such agreement will be presented to American as a proposed modification of Section 13 of the collective bargaining agreement between American and APA." In essence, the status quo became a right to a particular process and whatever result it yielded. The facilitation agreement did not explicitly detail what would occur in the event the two unions failed to reach an agreement. Implicit in its arrangement, however, is that the Class would be bound

by the terms of the American-APA collective bargaining agreement as those terms existed at the time the NMB extended APA's certification as the bargaining representative for the entire Class, whether or not such terms had been modified by an agreement struck between APA and ALPA. As such, Supplement CC provided the status quo terms for the Class. This status quo determination is not, as Appellants argue, akin to finding a waiver of statutory rights. Instead, it illustrates that the Class' statutory rights were not in issue because there was no modification of the status quo. Pursuant to the facilitation agreement, the Class consented to be bound by the APA-American collective bargaining agreement, including Supplement CC, upon the appropriate declarations by the NMB.

Consideration of the terms of the expired transition agreement does not alter the analysis. With respect to the issue of seniority, the transition agreement did no more than rank the former TWA pilots vis-a-vis themselves. Indeed, it intentionally excluded any reference as to what sort of seniority agreement would ensue upon a determination by the NMB that TWA-LLC and American constituted a single employer.

While no case is directly on point, Ass'n of Flight Attendants v. USAir, Inc., 24 F.3d 1432 (D.C. Cir. 1994) lends support to this position. In AFA, USAir had assumed managerial control over Shuttle's flight operations. The USAir pilots were represented by AFA, and the Shuttle pilots were represented by TWU.

After the NMB declared USAir and Shuttle to be a single transportation system, extinguished TWU's certification, and certified AFA as the bargaining representative for both Shuttle and USAir flight attendants, USAir insisted that the Shuttle employees were still covered by the terms of the Eastern-TWU agreement until a new agreement is negotiated. AFA then filed suit against USAir, contending that the AFA-USAir agreement necessarily establishes the terms and conditions to be applied to Shuttle flight attendants until a new agreement is negotiated. The D.C. Circuit held that the Eastern-TWU agreement fixed the status quo in the bargaining relationship between USAir and AFA on behalf of Shuttle flight attendants. Consequently, the terms of that agreement govern the working conditions of Shuttle flight attendants until USAir and AFA agree otherwise. The Circuit defined the issue as follows: "whether, as a matter of law, the Board's termination of TWU's certification simultaneously caused the 'status quo' for Shuttle flight attendants to be changed so as to be defined by the terms in the AFA-USAir agreement rather than in the Eastern-TWU agreement." In answering this in the negative, the court made several observations pertinent to our inquiry. The court pointed out that the AFA-USAir agreement did not *mandate* that its coverage be extended to new units of flight attendants. Significantly, the court states that "there is no doubt that AFA and USAir could have included some such clause in their agreement to cover new units or groups of flight attendants added to the USAir transportation system."

22

This observation implies that an incoming group would be bound by such a clause despite not being provided any opportunity to bargain over the clause. In the case at bar, the American/APA collective bargaining agreement, as supplemented by Supplement CC, did contemplate inclusion of Appellants. American and APA had in fact agreed upon the terms, including the seniority terms, that would govern the combined pilot bargaining unit when the NMB issued a single employer determination and extended the APA's representational certification to cover the combined unit. The D.C. Circuit's observations here are admittedly dicta, but lend support to the view that the status quo provisions of the RLA are not implicated in this case. As such, Appellants' claim that APA breached its duty of fair representation after April 3, 2002 by failing to enforce the Class' status quo is without merit.

Accordingly, we affirm the District Court's decision on Count II of the Second Amended Restated Complaint.

*Counts III & IV*

Count III of Appellants' Second Amended Restated Complaint charges American and TWA-LLC with breach of the duty to treat with the Class' certified representative pursuant to 45 U.S.C. § 152, Ninth. Count IV avers that American and TWA-LLC each failed to negotiate in good faith, pursuant to 45 U.S.C. § 152, First.[4] Appellees claim that only a certified representative would have a right to bring a cause of action under 45 U.S.C. § 152, First & Ninth. The Class advances two theories in asserting its right to bring a cause of action under these provisions. First, the Class argues that an implied right of action against American and TWA-LLC is created in its favor by 45 U.S.C. § 152, Second & Ninth. Second, the Class contends that its claims against American and TWA-LLC are properly brought as the "hybrid" claims pursuant to Childs v. Pennsylvania Federation Brotherhood of Maintenance Way Employees, 831 F.2d 429 (3d Cir. 1987). The District Court found that 45 U.S.C. § 152, Second & Ninth do not create an implied right of action in favor of the Class and that the Class had no standing to bring Counts III and IV against American and TWA-LLC. We affirm the District Court's dismissal on these grounds.[5]

_____

[4]Although the RLA does not state an express duty to negotiate in good faith, this duty is implied throughout section 152. While Appellants' Second Amended Restated Complaint cites to section 152, First & Ninth, a duty to negotiate in good faith is more clearly implicated in section 152, Second ("[a]ll disputes . . . shall be considered, and, if possible, decided . . . in conference between representatives designated"). As explained in the text, however, none of these provisions provide a private cause of action for Appellants.

[5]Our disposition of Counts III and IV obviates the need to consider, as argued by

23

The RLA does not expressly grant a private right of action to enforce its provisions. Although the legislative history of the RLA is silent on the issue of whether Congress intended to imply a private right of action under the RLA, see Texas & N.O.R. Co. v. Brotherhood of Ry. & S.S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed 1034 (1930), "the failure of Congress expressly to consider a private remedy is not inevitably inconsistent with an intent on its part to make such a remedy available." Transamerica Mort. Advisors, Inc. v. Lewis, 444 U.S. 11, 17, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). An intent to imply a private remedy may lie implicitly in the language or structure of a statute. Id. The Supreme Court has promulgated factors for determining whether a private remedy is implicit in a statute not expressly providing one. Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

Courts have found private rights under other provisions of 45 U.S.C. § 152. Applying the Cort v. Ash factors, many courts have implied a private right of action for individual employees within 45 U.S.C. § 152, Third & Fourth of the RLA. See, e.g., Roscello v. Southwest Airlines Co., 726 F.2d 217, 220 (5th Cir. 1984); Adams v. Fed. Express Corp., 547 F.2d 319, 321 (6th Cir. 1976), cert. denied, 431

American and TWA-LLC, whether Appellants' claims fail to state claims for relief or pose a representational dispute subject to the exclusive jurisdiction of the NMB.

U.S. 915, 97 S.Ct. 2177, 53 L.Ed.2d 225 (1977); Beckett v. Atlas Air, Inc., No. 95-0480, 1995 WL 498703 (E.D.N.Y. Aug. 14, 1995); Int'l Ass'n of Machinists and Aerospace Workers v. Altair Airlines, Inc., 481 F.Supp. 1359, 1360 (E.D. Pa. 1979). Implying a private cause of action for individual employees under 45 U.S.C. § 152, Third & Fourth of the RLA is appropriate given that those sections prohibit carriers from discriminating against *employees* in connection with union organizing activities. See Int'l Ass'n of Machinists v. Northwest Airlines, 673 F.2d 700, 707 (3d Cir. 1982). In Adams, however, the Sixth Circuit held that "the Railway Labor Act confers no implied right of action upon an *uncertified union* to maintain a suit on behalf of employees it seeks to represent." Adams, 547 F.2d at 322 (emphasis added). Furthermore, research has not revealed any cases where the federal courts have allowed individual employees to pursue RLA statutory claims outside of 45 U.S.C. § 152, Third & Fourth, except for duty of fair representation suits against a union.

In contrast to 45 U.S.C. § 152, Third & Fourth, 45 U.S.C. § 152, Ninth & Second does not create a private right of action for individual employees. In determining whether Appellants have an implied right of action under 45 U.S.C. § 152, Ninth & Second of the RLA, we must employ the four factors set forth in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), specifically focusing on the first two factors: (1) whether plaintiff is a member of the class "for

whose especial benefit the statute was enacted"; and (2) whether there is evidence of legislative intent to create or preclude the relief sought. Id. at 78; see Touche Ross & Co. v. Redington, 442 U.S. 560, 575-76, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Unlike 45 U.S.C. § 152, Third & Fourth, which are directed specifically at the employer's relationship with *employees*, 45 U.S.C. § 152, Ninth & Second are directed at the employer's relationship with the certified *representative.* 45 U.S.C. § 152, Ninth of the RLA provides that the NMB shall resolve "disputes as to who are the representatives of the employees designated and authorized in accordance with the requirements of this Chapter" and to certify a designated union as bargaining agent. 45 U.S.C. § 152, Ninth. It provides further that "upon receipt of such certification the carrier shall treat with the *representative* so certified as the representative of the craft or class for the purposes of this Chapter." § 152, Ninth (emphasis added). 45 U.S.C. § 152, Second of the RLA similarly provides that "[a]ll disputes between a carrier . . . and its . . . employees shall be considered, and, if possible, decided, with all expedition, in conference between *representatives designated* and authorized so to confer, . . ." § 152, Second (emphasis added).

We agree with the District Court that Appellants "are not within the definition of the class that the statute was designed to protect" because "[t]he statute does not state that the carrier must 'treat' with its employees, but rather with their representative." That the statute may indicate a congressional intent to create a private cause of action for a duly certified representative that is injured pursuant to these provisions does not imply that Congress intended to create a private right of action for any group or groups of individual employees claiming to act on behalf of the relevant employees. Cf. Adams.

A number of additional factors militate against granting individual employees a right to assert claims under 45 U.S.C. § 152, Second & Ninth. Allowing a group or groups of individual employees to bring a cause of action under section 152, Second or section 152, Ninth of the RLA would undermine the provisions' purpose of providing for an organized process of negotiation between one employee representative and the employer, and could lead to chaos. A bargaining agent, as opposed to any of its individual members, is in the best position to bring forth these types of grievances because a union is required to act in the best interests of *all* its principals. Moreover, and importantly, individual employees claiming to be aggrieved by the failure to treat or the failure to negotiate in good faith already have a remedy–individual employees may press a duty of fair representation claim against the appropriate representative(s), as was done by Appellants in this case, or the certified representative may bring a suit against the carrier. Pursuant to this analysis, Appellants as a class lack an implied private right of action to bring claims

asserting breaches of the duty to bargain and duty to negotiate in good faith against American and TWA-LLC because they are not and have never been a certified representative of the TWA pilots.

The District Court did not address the Class' second theory in support of federal standing in Counts III and IV--that it could bring a "hybrid" claim under Childs against American and TWA-LLC.

In Childs, 831 F.2d 429, a railroad employee brought suit in federal court charging his union with a breach of its duty of fair representation, and also charging his employer with a breach of the collective bargaining agreement. Even though the claim against the employer constitutes a "minor dispute" within the exclusive jurisdiction of the NRAB, 45 U.S.C. § 153, we held that an employee may bring this claim against his employer in federal court. We held this because it was alleged that the employee could not obtain meaningful relief before the Board against the employer because the union's breach of its duty of fair representation had precluded the employee from presenting crucial evidence to the Board. We stated that "[o]ne important policy of the RLA . . . is to afford employees means for relief. Therefore, courts have formulated exceptions to the jurisdictional scheme of the RLA where it appears that without such access to the federal courts the employee's right to redress would be jeopardized." 831 F.2d at 437. Thus, even though an employee would normally have to arbitrate a minor dispute before the Board, the employee was permitted to

proceed in federal court because he could not obtain meaningful relief before the Board.

Childs does not apply in this case. To begin with, we expressly stated in Childs that we were addressing "the rare case in which the union, by breaching its DFR, effectively precludes the employee's opportunity for obtaining relief before the NRAB." 831 F.2d at 441. Unlike Childs, the Class in the instant suit has not alleged that American and/or TWA-LLC breached a collective bargaining agreement. Childs also involved an employee's loss of an express statutory right, whereas only an implied right was claimed by the Class in the present case. Moreover, the stated goal of Childs was carrying out the RLA's central policy of affording employees some fair and efficient means of redressing their grievances. This is not the situation in the present case. If a union breaches its duty of fair representation by failing to require a carrier to treat with it, as required by section 152, Ninth of the RLA, an individual employee's remedy lies in a duty of fair representation action against the union, not a major dispute claim against the carrier. As noted, Appellants may proceed against ALPA in this case.

Because we hold that Appellants may not pursue the claims averred in Counts III and IV, the District Court's dismissal of these claims is affirmed.

*Counts V - IX*

In Counts V through IX of their Second Amended Restated Complaint, Appellants allege state-law violations by

26

Appellees, which they plead in the alternative to their federal claims. Counts V and VI allege that American, TWA-LLC, and APA engaged in tortious and malicious interference and fraudulent misrepresentation with respect to the collective bargaining agreement between ALPA and TWA. Appellants claim that as a result of the alleged interference and misrepresentations, ALPA agreed to the waiver agreement to Appellants' detriment and breached its duty of fair representation. Appellants proceed to claim in Counts VII and VIII that American and TWA-LLC breached the transition agreement by failing to use their best efforts to secure a fair and equitable process for seniority integration. APA allegedly tortiously interfered with American and TWA-LLC's contractual obligations under the transition agreement by causing them to breach. Finally, Count IX alleges that American, TWA-LLC, APA, and ALPA conspired with the common design of abrogating the TWA seniority integration provisions and endtailing the vast majority of TWA pilots in favor of the incumbent American pilots. The District Court dismissed Counts V though IX as preempted by the RLA.

Appellants argue that the District Court erred in dismissing their state-law claims against APA, American, and TWA-LLC. The District Court's decision relied on the preemption doctrine established in San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), which was extended to the RLA in Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). Under Garmon, state-law causes of action are presumptively preempted where they concern conduct that is actually or arguably either protected or prohibited by federal labor relations law. Pennsylvania Nurses Ass'n v. Pennsylvania State Educ. Ass'n, 90 F.3d 797, 801 (3d Cir. 1996). The two explicit exceptions to this preemption apply to conduct "deeply rooted in local feeling and responsibility" and to matters of only "peripheral concern" to federal labor relations law. Garmon, 359 U.S. at 243-44. Despite the generally sweeping nature of Garmon preemption, the Supreme Court has recognized judicial responsibility to "determine the scope of the general rule by examining the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme." Farmer v. United Bhd. of Carpenters and Joiners of Am., Local 25, 430 U.S. 290, 297, 97 S.Ct. 1056, 1062, 51 L.Ed.2d 338 (1977).

A principal purpose of the RLA is to provide for the prompt and orderly settlement of all disputes over pay, rules, or working conditions and the interpretation and application of agreements concerning pay, rules, or working conditions. RLA § 2, 45 U.S.C. § 151a. Appellants' state-law claims all involve alleged interference with their employment rights as established by the various agreements that govern their wages and other benefits as well as their right to be fairly represented under RLA §

2, 45 U.S.C. § 152. Thus the property rights at issue are founded upon federal law, derive their strength and protection from federal law, and exist to effectuate a nationwide federal labor policy. See Wilkes-Barre Pub. Co. v. Newspaper Guild of Wilkes-Barre, Local 120, 647 F.2d 372, 380-81 (3d Cir. 1981).

Having determined that Appellants' contractual rights are protected by federal labor law, which satisfies the presumptive preemption of Garmon, we now consider whether any exception to this presumption applies. The state-law claims alleged seek to protect Appellants' rights as established through their collectively-bargained agreements. Thus they do not concern conduct touching interests deeply rooted in local feeling and responsibility. See Wilkes-Barre, 647 F.2d at 381 (holding that tortious interference with a labor contract is not conduct touching interests deeply rooted in local feeling and responsibility). Nor is this a matter of only peripheral concern to federal law. Clearly, the process of seniority integration in the event of an acquisition directly affects the wages and other benefits of workers. The RLA determines the rights, obligations, and duties of employees, their representatives, and carriers with respect to negotiations and agreements concerning such a central aspect of employment. Thus, federal law is directly concerned with the issues here.

Appellants argue that with respect to their claims against APA, there can be no preemption of state-law claims if APA owed no duty to them. They assert that the District Court's finding that APA owed no duty necessarily means that the RLA does not apply to this conduct. For support, Appellants rely on Krantz v. Air Line Pilots Association, International, 427 S.E. 236 (Va. 1993), where the Virginia Supreme Court held that the RLA did not preempt a job applicant's right to sue a union for tortious interference with prospective employment. While expressing no opinion on the Krantz holding itself, Appellants' situation is distinguishable. The court in Krantz based its decision on the proposition that a job applicant "has no federally protected right" to employment under the RLA. Krantz, 427 S.E. at 329-30. Here Appellants seek to protect their rights in an existing employment relation as provided by the relevant collective bargaining agreements and the statutory protections of the RLA. These rights stem from federal law, so Krantz is inapposite.

The rights and duties of unions in carrying out their representational functions is an area where "the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law." Condon v. Local 2944, United Steelworkers, 683 F.2d 590, 594-95 (1st Cir. 1982) (quoting Local 20, Teamsters Union v. Morton, 377 U.S. 252, 261, 84 S.Ct. 1253, 1259, 12 L.Ed.2d 280 (1964)). The importance of uniform relations among employees, unions, and employers may call for preemption of state protections of federal

rights, even where federal law does not impose an analogous duty. See Kaufman v. Allied Pilots Ass'n, 274 F.3d 197 (5th Cir. 2001) (holding airline passengers' state-law claims against union preempted by federal law, despite lack of equivalent remedy to passengers). Appellants' relief for any violations of their contractual or statutory rights must come in the manner prescribed by federal law.

Appellants argue with respect to the claims against American, that the RLA cannot apply to the period of time for which Appellants were not employed by American and thus the state-law claims cannot be preempted. Appellants rest their argument primarily on our decision in Felice v. Sever, 985 F.2d 1221 (3d Cir. 1993). In Felice, we held that state-law claims that did not implicate a collective bargaining agreement covered by § 301(a) of the Labor Management Relations Act (LMRA) did not give rise to immunity of union officials under § 301(b). In part, we reasoned that because the plaintiff in that case was not covered by a collective bargaining agreement and thus not represented by a labor organization, § 301 did not apply to the relationship between the parties and could not serve to preempt state law. This case, though instructive, is not directly applicable because it involves provisions of the LMRA which have no corresponding provision in the RLA.

Appellants urge that the RLA and its arbitration provisions only apply to disputes between a carrier and its employees. However, the plain language of the statute does not support such a limitation on the RLA's scope. The RLA covers "disputes between an employee or group of employees and a carrier or carriers by air" not merely disputes between a carrier and its own employees. RLA § 204, 45 U.S.C. § 184. We thus believe that congressional intent was to submit such disputes to the RLA resolution mechanisms. See Pyles v. United Air Lines, Inc., 79 F.3d 1046, 1050-52 (11th Cir. 1996) (holding that employees of one carrier may seek relief under the RLA for disputes with another carrier). Preemption of the state-law claims is therefore appropriate, and Appellants' argument must be rejected.

We conclude that Appellants' state-law claims seek to protect their contractual rights negotiated under the auspices of the RLA and not any independent state-law right. Cf. Hawaiian Airlines Inc. v. Norris, 512 U.S. 246, 260-61, 114 S.Ct. 2239, 2247-48, 129 L.Ed.2d 203 (1994) (finding a state whistleblower statute to provide an independent right not to be discharged). Appellants' state-law claims were properly dismissed as preempted by the RLA.

V. Conclusion

We reverse and remand on Count I of Appellants' Second Amended Restated Complaint. We affirm the District Court's dismissal of all remaining Counts of the Second Amended Restated Complaint.

FISHER, *Circuit Judge*, dissenting.

I dissent because I disagree with the majority's analysis of Count I. I join the

majority's affirmance of the remainder of the claims on appeal. But I would affirm the district court's determination of the untimeliness of the Class' claims in Count I asserting that the Air Line Pilots Association ("ALPA") breached its duty of fair representation ("duty") under the Railway Labor Act, 45 U.S.C. § 151, et. seq.

A fundamental premise of the majority opinion is that Supplement CC (the November 8, 2001 agreement between American's pilots and American regarding seniority integration of former TWA pilots and American's pilots) was not the inescapable result of the Class' waiver of Allegheny-Mohawk labor protective provisions in April of 2001. The subject of the scope of the waiver and whether it included the right to bargain over seniority integration post-purchase was precisely why American required the waiver of those rights as a condition precedent to its purchase of TWA's assets out of bankruptcy. This was to avoid conflict between the collective bargaining agreements applicable respectively to the American and TWA pilots regarding seniority (which absent the waiver contained irreconcilable seniority provisions).[6] Because the April 2001

waiver clearly and unmistakably included a waiver of the Class' contractual right to arbitrate seniority integration issues and their right to bargain over seniority after American's purchase of TWA, any claim that ALPA breached its duty of fair representation to the Class accrued at that time.

There were no rays of hope to extend the accrual of the duty of fair representation claims based on ALPA's post-waiver actions or inaction. The waiver and its attendant agreements (the Transition Agreement between the Class pilots and TWA, LLC and the "best efforts" letter from American) eliminated ALPA's ability to effectively bargain with either TWA, LLC or American for any seniority integration different from that which existed at the time of the waiver. Because of the limitations these agreements imposed upon ALPA's ability

---

[6]The collective bargaining agreement between TWA and its pilots contained *Allegheny-Mohawk* labor protective provisions including the right to arbitrate seniority integration in the event of a merger with another airline. *See Allegheny-Mohawk Merger Case*, 59

C.A.B. 22, 31-40 (1972). The collective bargaining agreement between American and its pilots (represented by the Allied Pilots Association) contained a provision that pilots new to American due to the acquisition of another airline will not begin to accrue seniority until they begin working for American (endtailing). Seniority governs rates of pay, flight schedules and routes, type of airplane flown, whether pilots fly as captain or first officer and their eligibility for furlough and recall.

to bargain with TWA, LLC[7] or American regarding seniority, any meaningful ray of hope was extinguished. The only actions that ALPA could take were collateral to the real issue – a desire by the TWA pilots to get that which was waived in April 2001 – the right to demand a fair and equitable seniority integration. Consequently, the claim that ALPA breached its duty of fair representation is untimely and the district court's grant of summary judgment should be affirmed.[8]

## I.

The Class alleges in Count I that ALPA violated its duty of fair representation relating to ALPA's representation of TWA pilots both prior and subsequent to American's purchase of TWA out of bankruptcy. The Class contends that in April 2001, ALPA coerced the TWA Master Executive Council into waiving the TWA pilots' contractual labor protective provision to arbitrate over seniority integration because of ALPA's alleged interest in organizing the American pilots, who were then represented by the Allied Pilots Association. In its Second Amended Restated Complaint filed January 27, 2003, the Class pleaded for the first time additional duty claims, all of which flow from the waiver of the right to arbitrate seniority integration. Those claims are that ALPA: (1) failed to require American and TWA, LLC to negotiate the terms of the seniority integration with ALPA while ALPA remained the certified collective bargaining agent for the Class; (2) failed to take action to challenge Supplement CC though the agreement was entered into to control matters relating to rates of pay, rules and working conditions of the Class and was entered into with other than ALPA as the Class' collective bargaining agent in violation of the Railway Labor Act; and (3) that ALPA permitted American and TWA, LLC to require the TWA Master Executive Council[9] to negotiate seniority integration with American's pilots's union, the Allied

---

[7]TWA, LLC was the wholly-owned subsidiary of American that employed the former TWA pilots upon American's purchase of TWA's assets from bankruptcy.

[8]Summary judgment arose in the context of the Appellees' motion to dismiss the second amended class complaint pursuant to Rule 12 (b)(6) of the Federal Rules of Civil Procedure. Because the parties relied on information outside the pleadings, the 12(b)(6) motion was converted to a motion for summary judgment. The Class filed a Rule 56(f) affidavit in opposition to the motion. However, that Affidavit did not provide with any specificity the information sought to be discovered to defeat the pending motion. But the question of the propriety of the conversion in light of the Rule 56 motion is not before us.

[9]TWA pilots were represented by ALPA through the Master Executive Council comprised of TWA pilots, including some members of the Class.

Pilots Association.

At the crux of the Class' claims are the various agreements made on behalf of the TWA pilots in April of 2001 in relation to American's purchase of TWA assets, which combined to prevent ALPA from negotiating seniority integration for the former TWA pilots. A brief recitation of the relevant agreements evidencing the scope of the waiver and events surrounding their execution is necessary to frame the accrual analysis.

## II.

On January 9, 2001, American Airline subsidiary TWA, LLC agreed to purchase TWA assets out of bankruptcy. TWA's January 10, 2001 filing for bankruptcy protection was part of the planned acquisition by American. But an essential condition of American's purchase of the TWA assets was that American, which agreed to hire almost all of TWA's unionized employees through its wholly-owned subsidiary TWA, LLC, required the elimination of labor protective provisions within TWA's collective bargaining agreements with its unions. Specifically, American required the waiver of the right of TWA pilots to arbitrate seniority integration in the event of a purchase of TWA by another airline.

TWA filed a motion in bankruptcy court on March 15, 2001, pursuant to 11 U.S.C. § 1113 seeking to abrogate the TWA-ALPA collective bargaining agreement for the pilots' refusal to forego their seniority integration protections. The TWA pilots were faced with the choice of waiving their seniority integration protections or fighting to retain them at the risk of forcing TWA into liquidation. *See In re Trans World Airlines, Inc.*, 322 F.3d 360 (3d Cir. 2000). In response to the motion, the TWA Master Executive Council resolved to waive the seniority integration protections in exchange for American's assurances that it would "use its reasonable best efforts" with Allied Pilots Association to "secure a fair and equitable process for the integration of seniority" upon the sale of TWA to American.[10]

TWA and its pilots' Master

---

[10]The letter by American to TWA Master Executive Council President Robert Pastore provides:

> I understand that you wish to have confirmation of American's commitment on its part with respect to process for resolving integration of seniority. For its part American Airlines, Inc. ("American") agrees to use its reasonable best efforts with its labor organization representing the airline pilots craft or class to secure a fair and equitable process for the integration of seniority. In that regard, American will engage a facilitator to organize meetings with the labor organizations representing airline pilots and American and TWA-LLC. American agrees to adopt the procedures that result from this process for seniority integration.

Executive Council subsequently entered into a Stipulation approved by the Bankruptcy Court on April 6, 2001. Pursuant to that Stipulation, TWA withdrew its section 1113 motion and was authorized to eliminate the seniority integration protections from its pilot's collective bargaining agreement. The terms of the Stipulation and the circumstances and import of the waiver of seniority integration protections were echoed in the April 3, 2001 announcement made to TWA pilots by Robert Pastore, President of the pilot's Master Executive Council.

On April 9, 2001, the Bankruptcy Court approved the sale of TWA's assets, resulting in the Class becoming employees of TWA, LLC. That same date, ALPA and TWA, LLC entered into a "Transition Agreement," providing that ALPA would remain the exclusive bargaining representative for the former TWA pilots until the National Mediation Board found American and TWA, LLC to be a single carrier whose pilots were represented by the Allied Pilots Association. By its terms (set forth in Section 30), the Transition Agreement was not amendable during the transition period and would expire upon National Mediation Board certification of single carrier status. Section 1B of the Transition Agreement further provided that TWA-LLC could modify the work rules and benefits as necessary upon 21-days notice in order to effect the transition of the former TWA pilots to American. Significantly, during that 21-day notice period, section 1B specified that "in lieu of

any bargaining obligations under the Railway Labor Act, TWA, LLC's sole obligation shall be to confer with ALPA on all changes..." and provide those changes in writing.

### III.

Claims for breach of the duty of fair representation under the Railway Labor Act are subject to a six-month limitations period. *Miklavic v. USAir, Inc.*, 21 F.3d 511, 556 (3d Cir. 1994); *Sisco v. Consolidated Rail Corp.*, 732 F.2d 1188 (3d Cir. 1984) (applying *DelCostello v. Int'l Board of Teamsters*, 462 U.S. 151, 158 (1983). The district court concluded that the Class' claims against ALPA for breach of the duty of fair representation accrued at the latest by April 6, 2001, when the Stipulation waiving seniority integration rights was entered by the Bankruptcy Court. The court reasoned that since the resolution waiving seniority integration rights was agreed to on April 2, 2001, and approved by the Bankruptcy Court on April 6, 2001, the claims against ALPA, which were not filed until September 3, 2002, clearly were beyond the six-month limitations period. In so holding, the district court relied upon *Local Lodge No. 1424 v. National Labor Relations Board*, 326 U.S. 411, 415-17 (1960) for the proposition that the limitations period begins to run from the date of the execution of the challenged agreement. *Bensel v. Allied Pilots Ass'n*, 271 F. Supp 616, 622 (D. N.J. 2003).

The majority concluded that *Local Lodge* bars the Class' claims only if the

limitations period associated with ALPA's initial breach of its duty accrued on April 6, 2001, and that all subsequent breaches of its duty were "inescapably grounded" in that breach. It did not find that these conditions were met. *Local Lodge*, 326 U.S. at 422. Unlike the majority, however, I conclude that both of these conditions were met to warrant application of *Local Lodge* for accrual purposes. I disagree that Supplement CC[11] and the allegations that ALPA breached its duty of fair representation post-waiver constituted breaches separate from the initial breach of ALPA's duty – that it coerced the pilots into waiving their seniority integration protections. Rather, I conclude, as the

---

[11]From February to October 2001, the Allied Pilots Association and the TWA Master Executive Council attempted to negotiate seniority integration terms, even using the services of a mediator paid for by American. When those negotiations failed to produce an agreement regarding seniority integration, American and its pilots executed a seniority integration agreement known as Supplement CC on November 8, 2001, which called for some dovetailing of TWA pilots among the American pilots for seniority purposes. That agreement amended Section 13 of the original agreement between American and its pilots that otherwise would have governed seniority integration. Supplement CC would not become effective until single-carrier designation and certification of a collective bargaining agent for the combined pilot class.

district court recognized, that the waiver subsumed any rights to bargain for seniority integration from April 2001 forward. That includes the claims that subsequent to the waiver, ALPA breached its duty by failing to challenge Supplement CC, failing to negotiate seniority integration with the Allied Pilots Association during the transition period, and permitting American to dictate that seniority integration would be negotiated between the two pilot's unions.

A.

The waiver must be viewed not as a singular act in April 2001 but as a series of agreements that effectively waived any right to bargain for seniority integration with either TWA, LLC or American. First, the TWA Master Executive Council agreed to waive seniority integration protections in exchange for TWA's withdrawal of its bankruptcy motion to eliminate its contractual obligations with its unions. That waiver also was conditioned on American's promise to use its "best efforts" to facilitate an agreement between the two pilot's unions regarding seniority integration. But that promise by American represented an obligation merely to support the process of negotiation between the dueling unions in their attempt to reach an agreement concerning a "fair and equitable" seniority integration. It was not an obligation for American to bargain with ALPA or the Master Executive Council regarding a "fair and equitable" seniority integration. That is what was forfeited in April 2001 when the seniority integration protections were

waived.

Second, the Transition Agreement by its terms was not amendable and expired by its own terms once TWA, LLC and American are deemed a single carrier by the National Mediation Board. Nor did it require that TWA, LLC engage in any bargaining with ALPA regarding changes to work rules or benefits during the transition period. All that was required was written notice 21 days before any changes were to be made.

Given these agreements, the claims concerning ALPA's breach of its duty subsequent to the waiver are in fact "inescapably grounded" in the waiver and the attendant agreements of April of 2001. All that was left was a promise by American to use its "best efforts" to support union to union negotiations regarding seniority integration. The claims that ALPA breached its duty of fair representation thus are inescapably grounded in ALPA's conduct in negotiating the waiver. Consequently, the claims are untimely.[12]

---

[12]The majority finds that the claims that ALPA also breached its duty post-waiver are timely using "relation back" under Fed. R. Civ. P.15 (c). However, that analysis is premised on the finding that the initial claim that ALPA breached its duty filed on September 3, 2002 – that ALPA coerced the TWA Master Executive Council into waiving seniority integration given ALPA's interest in organizing the American pilots – was timely filed. For

## B.

The waiver clearly and unequivocally included the right to bargain with either TWA, LLC or American regarding seniority. See *Gullickson v. Southwest Airline Pilots' Association*, 87 F.3d 1178 (10th Cir. 1996).

*Gullickson* involved the purchase of Morris Air, whose pilots were non-union, by Southwest Airlines. Southwest sought a waiver of the scope provisions of its agreement with the Southwest pilots' union. Despite the fact that Morris pilots were not represented by it, the Southwest pilots' union met with Morris pilot representatives and obtained a list of priorities regarding job security. Thereafter, the union met with the Southwest and reached a Letter Agreement containing a scope of waiver clause as well as seniority provisions giving Morris pilots an effective seniority date of January 1, 1994. Morris pilots attended various

---

the reasons stated within this opinion, I diverge from the majority's conclusion that "rays of hope" tolled the accrual of the initial claim that ALPA breached its duty until April 2002. Rather, because that breach of duty claim accrued at the time of the waiver, relation back cannot save the claims that ALPA breached it duty subsequent to the waiver. The initial complaint must have been timely in order for relation back to save the claims that ALPA breached its duty subsequent to the waiver. *See e.g., Henderson v. Bolanda*, 253 F.3d 928, 931 (7th Cir. 2001).

informational meetings conducted by the Southwest pilots' union regarding the terms of that Letter Agreement.

In February 1994, the Southwest pilots' union became the collective bargaining representative for the Morris pilots. Three months later, Morris pilots ratified a collective bargaining agreement. On June 29, 1994, Morris pilots sued the Southwest pilots' union and Southwest for breach of the duty of fair representation resulting from the endtailing of the Morris pilots in the course of a seniority integration and failure to permit Morris pilots an opportunity to ratify the Letter Agreement. But the Court found that the language of the Southwest-Morris collective bargaining agreement was sufficiently clear to inform Morris pilots that ratification of it necessarily ratified the effect of the Letter of Agreement between the Southwest pilots union and Southwest regarding seniority integration.

Likewise, as the comments of TWA Master Executive Council President Robert Pastore to the entire pilot group reveal, the TWA Master Executive Council took the best option available – agreeing to the waiver to facilitate the purchase of TWA by American and to save as many contractual provisions as possible while still having to negotiate seniority integration with the American pilots' union during the transition period. This, when coupled with the language of the various agreements (as discussed *supra* at part III.A), supports the conclusion that there was a clear and unmistakable waiver of the right to bargain for seniority. But

"[a] voluntary choice may not be withdrawn because the choice was an effort to make the best of a bad situation. Adult pilots, of sound mind and well aware of the consequences of their acts, must expect to keep contracts, even when they wish they could have made better deals." *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524, 1534 (7th Cir. 1992).

IV.

Nor would I apply the "ray of hope" doctrine to toll the accrual of the claims that ALPA breached its duty until April 18, 2002, the date the arbitrator of the System Board of Adjustment denied the Class' challenge based on American's "best efforts" promise. *See Childs v. Penn. Fed'n Brotherhood of Maintenance Way Employees*, 831 F.2d 429, 434 (3d Cir. 1987) (holding that duty of fair representation claim does not accrue while the union continues to actively represent the employee and offers rays of hope that the employee's cause will prevail). The Class contends, and the majority accepted, that ALPA's arbitration of American's alleged breach of its "best efforts" letter necessarily impacted the viability of Supplement CC, which could have resulted in the invalidation of Supplement CC.

The fundamental flaw in the majority's application of the *Childs* "ray of hope" doctrine is its reliance on the premise that Supplement CC was not the inescapable result of the waiver of the seniority integration protections in April of 2001. "Rays of hope" cannot sustain a

36

claim when the waiver of seniority integration protections gutted any chance that ALPA could continue to represent the Class to reach a more advantageous seniority integration agreement. For the reasons stated previously, the waiver of seniority integration protections, and the attendant agreements executed in early April 2001, eliminated both contractual and any statutory duties to bargain for seniority thereafter. In other words, it stripped ALPA of any real negotiating strength or bargaining leverage with respect to the seniority integration of former TWA pilots within American. Moreover, even if ALPA prevailed in the arbitration concerning the "best efforts" letter, and American was found to have breached its "best efforts" promise, it still would not eliminate the fact that the Transition Agreement between ALPA and TWA, LLC was not amendable and precluded negotiations with TWA, LLC concerning seniority integration. Nor would a victory require American to bargain with ALPA concerning seniority integration. In order for a "ray of hope" to exist, there must be a meaningful hope that it can remedy the employee's dissatisfaction.

*Childs* was premised on promoting the federal labor policies of: (1) avoiding unnecessary federal litigation; (2) allowing full play of the administrative procedure; and (3) sparing the employee the Hobson's choice between letting the statute of limitations run and antagonizing his best advocate. 831 F.2d 434-35, 436. As to avoiding unnecessary federal litigation,

*Childs* recognized that "[i]f the union can indeed remedy the cause of the employee's dissatisfaction, it should be allowed to do so, thus obviating federal judicial involvement." *Childs*, 831 F.2d at 434; *see also Whittle v. Local 641, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, AFL-CIO, 59 F.3d 487 (3d Cir. 1995).

*Childs* and *Whittle* both dealt with claims to overturn unfavorable arbitration awards on grounds that the union committed errors in the arbitration proceedings. In *Childs,* the union declined to represent Childs before the Board due to a lack of corroborative evidence which Childs claimed to have provided to the Union during the grievance process. In *Whittle,* the union allegedly failed to prosecute a seniority case vigorously before the joint local committee. Those decisions are premised upon the policy to resolve disputes where possible through arbitration, thus obviating the need for judicial involvement if the union is able to remedy the cause to the employees' satisfaction. *See Childs,* 831 F.2d at 434. The claims in those cases therefore did not accrue for statute of limitations purposes until the employee learned of the arbitrator's award. Otherwise, there was no way for employees to know whether they suffered any loss from the union's alleged breach until the arbitration decision issued. *Whittle*, 56 F.3d at 490.

Here, however, the cause of the employee's dissatisfaction was not American's breach of its "best efforts"

37

obligation. Rather, the Class sought exactly that which it sacrificed in order to facilitate American's purchase of TWA – the right to arbitrate or otherwise dictate the seniority integration process. Extending a "ray of hope" here, where the waiver extinguished any meaningful prospect that the TWA pilots could control seniority integration, is not warranted on this record.

IV.

For the foregoing reasons, I would affirm the judgment of the district court granting summary judgment on Count I regarding all of the alleged breaches of the duty of fair representation. I concur in the remainder of the majority opinion.