Sherry COOPER, Cynthia Jones, Pamela Jackson, Paige Verducci, Wilson Aviles, Kristine Wolanske, Cathy Whittington, on behalf of themselves and all others similarly situated, and William O'Driscoll as representative of The International Association of Machinists and Aerospace Workers, Plaintiffs,

v.

TWA AIRLINES, LLC, American Airlines, Inc., and The Association of Professional Flight Attendants, John Ward as Representative, Defendants.

No. 02–CV–3477 NGKAM.

United States District Court, E.D. New York.

Nov. 23, 2004.

---

James P. Allen, Sr., Detroit MI, for plaintiff.

Thomas E. Remert Jr., Washington DC, Sam S. Shaulson, New York City, for American Airlines, Inc. and TWA Airlines, Inc.

Daniel Katz, Washington DC, James N. Blair, New York City, for John Ward as representative of Association of Professional Flight Attendants.

## OPINION & ORDER

GERSHON, District Judge.

Plaintiffs, suing as a class, are former Trans World Airlines, Inc. ("TWA") flight attendants who joined American Airlines,

Inc. ("American") when American acquired TWA following TWA's bankruptcy in early 2001. Defendants are American and its wholly owned subsidiary, TWA Airlines, LLC ("TWA–LLC") (jointly "Company defendants") and the Association of Professional Flight Attendants, John Ward as representative ("APFA"). Plaintiffs originally filed this action on June 14, 2002, and on March 3, 2003, they filed an Amended Complaint. Their claims deal with the events surrounding American's acquisition of TWA in 2001 and the subsequent furlough of 1,018 TWA–LLC flight attendants in the aftermath of the September 11, 2001 terrorist attacks. On June 20, 2003, plaintiffs filed a Supplemental Complaint, dealing with events surrounding American's reorganization in 2003 and an accompanying Restructuring Agreement between American and APFA ("Supplemental Complaint").[1] Plaintiffs' motion for a preliminary injunction enjoining American from implementing the Restructuring Agreement was denied by Judge Carol Bagley Amon of this court. *See Cooper v. TWA Airlines LLC*, 274 F.Supp.2d 231 (E.D.N.Y.2003). The case was reassigned to me on April 21, 2004.

Count One of the Amended Complaint alleges that American violated Sections 2 and 6 of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 152, 156. Counts Two through Eight allege that American and APFA violated state common law in various ways, namely, (2) breach of contract; (3) fraud; (4) negligent misrepresentation; (5) fraudulent inducement; (6) breach of the implied covenant of good faith and fair dealing; (7) promissory estoppel; and (8) unjust enrichment. All defendants move to dismiss the Amended Complaint. The Company defendants argue that plaintiffs lack standing under the RLA to bring Count One and that all of the state law claims are preempted by the RLA. APFA argues that the state law claims against it are preempted by the RLA and also fail on the merits.

The claims in the Supplemental Complaint will be the subject of additional motions not yet made.

## BACKGROUND

The allegations in the Amended Complaint, described below, are taken as true for the purposes of defendants' motions to dismiss.

This case arises out of the integration of former TWA flight attendants into American Airlines' workforce as part of American's acquisition of TWA in 2001. In January 2001, TWA and American entered into an agreement whereby American agreed to purchase substantially all of TWA's valuable assets in connection with TWA's planned Chapter 11 bankruptcy (the "Purchase Agreement"). Immediately after the Purchase Agreement was executed, TWA filed for bankruptcy and sought court approval of its terms. Contemporaneously, American formed a wholly owned subsidiary, TWA–LLC, to own and operate TWA's assets. TWA–LLC was formed as a transitory entity controlled by American that would cease to exist once the two airlines were fully integrated. Thus, TWA–LLC was American's "alter ego" for purposes of merging the two airlines.

At the time the merger negotiations between American and TWA were pro-

---

1. Three other related lawsuits pending before me, *Ford v. Association of Professional Flight Attendants*, 03–CV–4987, *Lindsay v. Association of Professional Flight Attendants*, 04–CV–634, and *Marcoux v. American Airlines, Inc.*, 04–CV–1376, also concern American's 2003 reorganization. Plaintiffs in those cases filed a consolidated class action complaint on July 12, 2004.

ceeding, the TWA flight attendants were represented by plaintiff International Association of Machinists and Aerospace Workers ("IAM"). Under IAM's collective bargaining agreement ("CBA") with TWA, in effect at the time bankruptcy protection was sought by TWA, the TWA flight attendants' occupational seniority rights were protected by what are known as *Allegheny–Mohawk* Labor Protective Provisions. Occupational seniority determines, among other things, the order of layoffs and recalls and the bidding priorities among flight attendants for selecting their monthly flying schedules. The *Allegheny–Mohawk* provisions in the CBA required TWA to insist that American agree to integrate the TWA flight attendant seniority lists under the standard process for fair and equitable integration established by the Civil Aeronautics Board in the *Allegheny–Mohawk Merger Case,* 59 CAB 19 (1972). At all relevant times during the negotiations, IAM's position was that TWA employees' occupational seniority date must be based on the date they entered the job classification at TWA for purposes of a fair and equitable integration. In other words, IAM sought to preserve the occupational seniority rights of TWA flight attendants upon their integration into American. American knew that any representations it made to IAM concerning these benefits were material to IAM in its decision-making process.

American's flight attendants were, and still are, represented by APFA. American's CBA with APFA did not contain *Allegheny–Mohawk* Labor Protective Provisions and did not allow American to adopt such provisions vis-à-vis other flight attendants in the event of a merger. Thus, American made waiver of the *Allegheny–Mohawk* provisions, among other changes to the CBA, a pre-condition to its purchase of TWA. In order to facilitate the purchase of TWA, American agreed and represented to IAM and its members that, if IAM voluntarily agreed to waive the *Allegheny–Mohawk* Labor Protective Provisions, TWA–LLC would adopt mirror benefits or would provide benefits no less favorable than those applicable to similarly situated American employees.

IAM was concerned about the integration of IAM-represented employees into the American/TWA–LLC workforce and repeatedly expressed this to American, stressing that seniority integration was an essential issue that needed to be resolved before the acquisition closed. IAM also filed limited objections, in the bankruptcy court, to TWA's agreement to amend the CBAs without finalizing job security and seniority integration issues with its unions.

On March 9, 2001, in response to IAM's concerns, American and TWA–LLC sent a letter to IAM which stated in relevant part:

> For its part, American Airlines, Inc. ("American") agrees to use its reasonable best efforts with its labor organizations representing the mechanics and related and flight attendant crafts or classes (collectively, "mechanics and flight attendants") to secure a fair and equitable process for the integration of seniority. In that regard, American will engage a facilitator to organize meetings with the labor organizations representing the mechanics and flight attendants and American and TWA–LLC. American agrees to adopt the procedures that result from this process for seniority integration of the mechanics and flight attendants.

This letter also included a recognition provision, under which TWA–LLC agreed to recognize IAM as the bargaining representative of the same employees it represent-

ed at TWA as of the date of closing of the purchase, subject to action by the National Mediation Board under the RLA.

Relying on the commitment to engage a facilitator and on American's repeated representations that TWA–LLC flight attendants would receive benefits, including seniority status, that mirrored those provided to American flight attendants, IAM withdrew its objections to the Purchase Agreement in the bankruptcy court. The bankruptcy court approved American's purchase of TWA on March 12, 2001.

On March 15, 2001, TWA filed a Section 1113 motion in the bankruptcy court seeking permission to abrogate all of the TWA CBAs then in effect. Abrogation would have eliminated the flight attendants' existing benefits, work rules and grievance procedures as well as IAM's right to represent the TWA flight attendants, essentially turning all TWA employees into "at will" employees. American advised the TWA flight attendants, through IAM, that, for the purchase to close without abrogation of all the CBAs, the labor unions had to agree to voluntarily waive certain provisions of the CBA, including the *Allegheny–Mohawk* provisions. In a letter dated March 15, 2001, the president of TWA, William Compton, assured the TWA employees that waiving these provisions would not compromise their employment or reduce their benefits.

On March 21, 2001, while the Section 1113 motion was pending before the bankruptcy court, the APFA Board of Directors adopted a resolution which set forth its position on seniority integration issues. The resolution proposed that TWA flight attendants would be "fenced into" TWA's two bases, John F. Kennedy International Airport and Lambert–St. Louis

International Airport, with their seniority intact.[2] It also provided that, for all other purposes, American flight attendants' occupational seniority lists would be preserved intact and that American flight attendants could bid against the TWA flight attendants at JFK and St. Louis, but TWA flight attendants could not bid against American flight attendants at other airports.

Following this APFA resolution, IAM increased its efforts to convince American to honor the commitment embodied in the March 9, 2001 letter to use its reasonable best efforts with APFA to secure a fair and equitable process for integration of seniority. In response, American sent a letter dated March 30, 2001 reaffirming its March 9th commitment and further agreeing to engage a facilitator within thirty days of the initial operation of TWA–LLC.

On April 4, 2001, while the Section 1113 motion was still pending, American, TWA and IAM entered into a Transition Agreement. Relying on American's representations regarding seniority benefits, IAM agreed, among other things, to waive the *Allegheny–Mohawk* provisions. The deal between American and TWA closed on April 9, 2001. TWA flight attendants became employees of TWA–LLC on or about April 10, 2001. Although a facilitator was retained to assist the integration process, APFA never met with IAM to resolve integration issues, and American took an increasingly hands off approach.

No integration agreement was in place at the time of the terrorist attacks of September 11, 2001. On or about September 15, 2001, American notified IAM it would be reducing operations and represented that it would furlough equal per-

---

**2.** "Fencing" is a process by which TWA flight attendants would retain their full seniority for bidding for flights at the two designated bases but would lose their seniority if transferred to a different American base.

centages of American and TWA–LLC flight attendants. However, contrary to this representation, in October 2001 American announced it would close TWA's New York operations at JFK International Airport, furloughing 1,018 TWA–LLC flight attendants, or twenty-five percent of the entire TWA–LLC workforce. American furloughed 400 American non-probationary flight attendants, or approximately two percent of the American flight attendant workforce.

Also in October 2001, TWA–LLC informed its flight attendants that their seniority accrual policy would be adjusted in accordance with American's policies. IAM advised American that, absent a seniority agreement between IAM and APFA, American had no authority to change the policy on seniority benefits. IAM also requested on December 3, 2001 that American submit the seniority integration issue to binding arbitration. On December 19, 2001, American for the first time revealed that it had been engaging in integration talks with APFA without IAM's participation. IAM objected to such discussions, and at that time American took the position that it had no obligation to allow IAM to participate in any seniority negotiations. The final APFA–American Seniority Integration Agreement provided an occupational seniority date of April 10, 2001, the date of purchase, for all former TWA flight attendants, thus placing them at the bottom of the list of American flight attendants for purposes of bidding on flights at all airports serviced by American, except St. Louis. For purposes of classification and company seniority dates, which determine longevity for pay purposes and vacation days, the Seniority Integration Agreement provided that the TWA flight attendants would "receive credit at American for their years of service at TWA and TWA–LLC."

Also in December 2001, APFA filed an application seeking a declaration from the National Mediation Board ("NMB") that American and TWA–LLC were a single carrier under the RLA for purposes of collective bargaining. By decision of March 19, 2002, the NMB ruled that American and TWA–LLC were a single carrier; APFA became the certified representative for flight attendants employed by TWA–LLC on April 19, 2002.

As a result of American's implementation of the final APFA–American Seniority Integration Agreement, TWA–LLC flight attendants' working conditions and rules were changed so as to deny them seniority rights after American's acquisition of TWA and so as to give an unfair advantage to the workers that APFA represented.

## DISCUSSION

In considering a motion to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept the factual allegations in the Amended Complaint as true and draw all reasonable inferences in favor of plaintiffs. *Bolt Electric, Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is appropriate only where it appears beyond doubt that plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. *Id.*

Attached as exhibits to the Amended Complaint are the March 9, 2001 letter, the March 30, 2001 letter, and the April 4, 2001 Transition Agreement between TWA–LLC and the flight attendants represented by IAM. These documents are considered part of the Amended Complaint pursuant to Federal Rule of Civil Procedure 10(c). Additionally, the Amended Complaint refers to, and relies on, the Purchase Agreement and the American–APFA Seniority Integration Agreement; these will also be considered as part of the

Amended Complaint for purposes of the motions to dismiss. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002).

### The Railway Labor Act

The Railway Labor Act, 45 U.S.C. §§ 151 *et seq.,* establishes a scheme for resolution of labor disputes in the rail and air transportation industries.[3] The RLA imposes a duty on "all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152, First. The Act provides detailed procedures to facilitate the voluntary settlement of disputes between carriers and their employees in an effort to avoid disruption in the nation's air and rail transportation systems. *See Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969) (describing the RLA's mediation and arbitration provisions).[4] The obligation "to exert every reasonable effort to make and maintain agreements," also known as the duty to bargain, is a judicially enforceable obligation. *Chicago & North Western Ry. Co. v. United Transp. Union,* 402 U.S. 570, 581–82, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971).

■ Disputes between labor and management under the RLA are characterized as either "major" or "minor." Major disputes are those concerning efforts to create contractual rights, *i.e.,* disputes over the formation of collective bargaining agreements or efforts to secure them. *See Consolidated Rail Corp. ("Conrail") v. Ry. Labor Executives' Ass'n,* 491 U.S. 299, 302, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989); *Baylis v. Marriott Corp.,* 843 F.2d 658, 663 (2d Cir.1988). "In 'major' disputes 'the issue is not whether an existing agreement controls the controversy.' They ['major disputes'] look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Baylis,* 843 F.2d at 663 (alteration in original) (quoting *Elgin, Joliet & Eastern Ry. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)).

■ Minor disputes, on the other hand, are those growing out of grievances or out of the interpretation or application of existing CBAs. In minor disputes, parties seek to enforce existing contractual rights. *See Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 252–53, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994); *Conrail,* 491 U.S. at 303, 109 S.Ct. 2477; *Baylis,* 843 F.2d at 662–63. The RLA establishes arbitral panels called "Adjustment Boards" which have exclusive jurisdiction over minor disputes. *See* 45 U.S.C. § 184; *Baylis,* 843 F.2d at 662–63. A finding that a claim constitutes a minor dispute under the RLA thus precludes the court from exercising jurisdiction over that claim. *See Hawaiian Airlines, Inc.,* 512 U.S. at 253, 114 S.Ct. 2239.

---

**3.** The entire RLA, other than Section 3 of the Act, 45 U.S.C. § 153, was made applicable to air carriers in 1936. *See* 45 U.S.C. § 181.

**4.** The RLA requires advance written notice of desired changes in rates of pay, rules, or working conditions, and conference between the parties. If the parties do not settle the issue in conference, either side may invoke the services of the National Mediation Board. If mediation fails to resolve the dispute, it will be submitted to binding arbitration upon the consent of both parties. *See* 45 U.S.C. §§ 152, 155, 156; *Jacksonville Terminal Co.,* 394 U.S. at 378, 89 S.Ct. 1109.

### Count One—Failure to Bargain Under the RLA

Count One of the Amended Complaint alleges that American violated Sections 2 and 6 of the RLA, 45 U.S.C. §§ 152, 156, by failing to initiate any of the prescribed methods of bargaining and mediation of major disputes under the statute and by failing to maintain the status quo in the interim. Plaintiffs allege that American failed to engage a facilitator as promised in the March 9, 2001 letter, and that it prevented the formation of a collective bargaining agreement that would have protected their seniority rights. They claim that this conduct was a bad faith rejection of American's obligations to bargain under the RLA.[5] Company defendants argue that plaintiffs lack standing under the RLA to bring this claim because IAM is no longer the certified representative of the former TWA flight attendants, and that plaintiffs fail to state a claim under the RLA. Plaintiffs argue that IAM has standing to bring a claim under Section 2, Ninth of the RLA because it was the employees' certified representative at the time of the conduct which is alleged to violate the RLA and, as such, is the only representative that could have brought suit under the RLA to address such conduct. Plaintiffs do not suggest any right of action available to the individual plaintiffs. *See Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 318 n. 4 (3d Cir.2004) (finding no private right of action for individual employees to bring a failure to bargain claim under Section 2 of the RLA).

Certified unions may bring suit against an employer in federal court to enforce their bargaining rights under the RLA. *See United Air Lines, Inc. v. Airline Div., Int'l Bhd. of Teamsters*, 874 F.2d 110, 115 (2d Cir.1989) (citing *Virginian Ry. Co. v. System Federation No. 40*, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937)) (holding that a union may enforce its certification rights by seeking an injunction compelling the employer to bargain). There is no disagreement among the parties that IAM was the certified representative of plaintiff flight attendants until April 19, 2002, when APFA became their certified representative as a result of the National Mediation Board's decision. It is clear that IAM would have been the proper party to bring a failure to bargain claim while it was still the certified representative of the employees. At that time it could have sought equitable relief, such as an injunction requiring good faith bargaining. No such relief is available to IAM now. Once IAM lost its representative status, American could have no duty to bargain with IAM, and IAM lost its ability to obtain a judicial order compelling American to bargain.[6] IAM offers no authority for the argument that it can now seek damages from American. Therefore, whether IAM is viewed as having lost its standing or as being unable to state a claim for relief under the RLA, IAM's claim in Count One must be dismissed.

---

**5.** In their opposition to the motion to dismiss, plaintiffs note that Count One, although pled against American, would probably be more appropriately pled against TWA–LLC, since plaintiffs were not legally employees of American until March 19, 2002, the date the NMB determined that American and TWA–LLC were a single carrier. If the standing issue were resolved in their favor, plaintiffs would move to amend Count One to include the proper defendant and "to make clear that American is being held liable only as an alter-ego." Plaintiffs' Opposition Brief at p. 34 n. 32. As will be seen, the issue is academic.

**6.** The scope of the duty to bargain that arises under the RLA during the pre-hire period, a question of federal law, need not be determined here. *See* preemption discussion, *infra*.

## Preemption

Plaintiffs' remaining claims are brought under state common law. They arise principally out of three repeatedly made promises: (1) American's promise to secure a fair and equitable process for seniority integration; (2) American's promise to engage a facilitator to organize meetings between APFA and IAM to negotiate a process for seniority integration; and (3) American's and TWA–LLC's promise that TWA–LLC would provide TWA employees with benefits, including seniority benefits, no less favorable than those applicable to similarly situated American employees. Plaintiffs also bring state claims based on alleged promises and representations made by APFA, namely, its representation that TWA flight attendants would retain seniority rights in the American workforce and its agreement with American, embodied in the Seniority Integration Agreement, regarding company seniority.

Count Two alleges three separate breaches of contract. As against American, plaintiffs allege that American breached its "explicit obligations under the March 9th Letter Agreement" (i.e., its promise to use its best efforts with its labor organizations to secure a fair and equitable process for seniority integration and its promise to engage a facilitator) "by, among other things, failing to make any efforts to involve its union, APFA, in a facilitated process together with IAM to secure a fair and equitable integration of the TWA, LLC Flight Attendants' seniority rights." As against TWA–LLC, Count Two alleges a breach of the Transition Agreement, in that TWA–LLC failed to provide IAM with any notice of proposed seniority changes agreed to by American and APFA in the Seniority Integration Agreement. Count Two also seeks to hold American liable for TWA–LLC's breach of the Transition Agreement. Finally, as to American and APFA, Count Two alleges that these defendants breached their obligation to plaintiffs, as third-party beneficiaries of the Seniority Integration Agreement, by failing to implement the terms of the agreement relating to company seniority. That is, plaintiffs allege that the Seniority Integration Agreement between American and APFA breached American's earlier agreements with them but they also in part seek relief under the Seniority Integration Agreement.

Counts Three, Four, and Five are various fraud claims against American and APFA; plaintiffs allege that American and APFA made material misrepresentations regarding the seniority benefits plaintiffs could expect at American and their intent to pursue a process for securing a fair and equitable integration of the two workforces, on which plaintiffs justifiably relied in waiving their *Allegheny–Mohawk* Labor Protective Provisions. Count Six alleges that American and APFA breached the implied covenant of good faith and fair dealing, arising out of the contractual obligations they assumed in connection with the purchase of TWA and the merger of the two workforces, by "stapling" the former TWA flight attendants' seniority list to the bottom of the American seniority list. Count Seven alleges promissory estoppel against American based on American's promises to use its best efforts to facilitate talks between IAM and APFA, to adopt the process for seniority integration that came out of those talks, and to secure a fair and equitable seniority integration process for the TWA–LLC flight attendants. Count Eight alleges that American and APFA have been unjustly enriched to the detriment of the individual plaintiffs by intentionally failing to secure a fair and equitable process for seniority integration and by intentionally failing to provide benefits, including seniority benefits, that mir-

rored those provided to American flight attendants.

■ All of plaintiffs' state law claims against American and TWA–LLC relate to the same promises and breaches as underlie the RLA claim in Count One, and all are governed by the preemption doctrine set forth in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Under *Garmon*, state law claims are presumptively preempted if they concern conduct that is actually or arguably either prohibited or protected by federal labor law. *See Belknap v. Hale*, 463 U.S. 491, 498, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983); *Garmon*, 359 U.S. at 245, 79 S.Ct. 773. Although *Garmon* preemption first arose in the context of the National Labor Relations Act ("NLRA"), and *Garmon* itself concerned the primary jurisdiction of the National Labor Relations Board ("NLRB"), the *Garmon* preemption doctrine has been extended to conduct governed by the RLA. *See Jacksonville Terminal Co.*, 394 U.S. at 383–84 n. 19, 89 S.Ct. 1109 (applying *Garmon* preemption principles while noting that "[t]here is … no administrative agency equivalent to the NLRB with jurisdiction over railway labor disputes"). Thus, state claims that attempt to regulate conduct protected or prohibited by the RLA are preempted. In the RLA context, as in cases arising under Section 301 of the Labor Management Relations Act, preemption is driven by the need for uniform federal regulation of labor-management relations. *See Peterson v. Air Line Pilots Ass'n*, 759 F.2d 1161, 1169 (4th Cir.1985) (finding that "the risk of state interference with the effective administration of national labor policy is present [in the RLA context] even though the exclusive jurisdiction of the arbitrator is not at issue"); *cf. Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 211, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (noting, in a Section 301 case, that interests in interpretive uniformity and predictability require that labor-contract disputes be resolved by reference to federal law).

Two exceptions to *Garmon* preemption provide that state regulation of conduct "deeply rooted in local feeling and responsibility" and of matters of "merely peripheral concern" to federal labor relations law is not preempted. *Garmon*, 359 U.S. at 243–44, 79 S.Ct. 773. These exceptions highlight the court's responsibility "to determine the scope of the general rule by examining the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme." *Farmer v. United Bhd. of Carpenters & Joiners of America, Local 25*, 430 U.S. 290, 297, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977).

The RLA governs the process of negotiation of "agreements concerning rates of pay, rules and working conditions" between carriers and their employees in order to provide for the prompt and orderly settlement of disputes. *See Bensel*, 387 F.3d at 321. The statute protects the right of employees to designate the bargaining representative of their choosing and imposes obligations on carriers and unions with respect to the negotiation of agreements and the settlement of disputes. *See* 45 U.S.C. § 152. The entire process of negotiation of these "working conditions" is governed by federal law in the form of the RLA, which "seeks to provide a means by which agreement may be reached with respect to" wages, hours, and working conditions. *Terminal R.R. Ass'n of St. Louis v. Bhd. of R.R. Trainmen*, 318 U.S. 1, 6, 63 S.Ct. 420, 87 L.Ed. 571 (1943). Interpretation of the collectively bargained agreements that result from this process is governed by federal law and is left to the arbitral panels established by the RLA.

*See Hawaiian Airlines,* 512 U.S. at 253, 114 S.Ct. 2239; *Lueck,* 471 U.S. at 210–11, 105 S.Ct. 1904.

Here, IAM sought to achieve certain labor protections from American in the context of American's acquisition of TWA. Plaintiffs had these protections in their CBA with TWA, but, under the terms of American's CBA with its existing flight attendants, American could not adopt the same protections. Thus, waiver of the protections was made a condition of the purchase. Waiver would have occurred involuntarily if the bankruptcy court had granted TWA's Section 1113 motion to abrogate its CBAs. Instead, IAM chose to voluntarily waive the protections as part of its negotiation of future seniority rights with American. This entire process of negotiation is governed by the RLA, as plaintiffs implicitly acknowledge by bringing a claim for failure to bargain under RLA § 2, First in Count One of their Amended Complaint. That plaintiffs were not yet employees of American when these negotiations took place does not mean that the negotiations were not subject to the rights and obligations defined by the RLA. *See Bensel,* 387 F.3d at 322 (finding that Congress intended to submit pre-hire disputes to the RLA resolution mechanisms); *Pyles v. United Air Lines, Inc.,* 79 F.3d 1046, 1051–52 (11th Cir.1996) (finding the RLA dispute mechanisms applicable in the context of an airline merger).

The essence of plaintiffs' complaint is their failure to secure occupational seniority rights in their CBA with American, allegedly as a result of the misconduct of the defendants, their employer and the union that represented them after the single carrier decision by the NMB. Plaintiffs' state law claims against American seek to regulate American's conduct in negotiating an agreement concerning the terms of their employment at American. IAM's suggestion that it was engaged merely in making "commercial" agreements with the airlines ignores that it was empowered to deal with the airlines on the subject of wages, hours and working conditions only because of its status as a certified representative under Section 2 of the RLA. As in *Bensel,* "the property rights at issue are founded upon federal law, derive their strength and protection from federal law, and exist to effectuate a nationwide federal labor policy." *Bensel,* 387 F.3d at 321. Therefore, plaintiffs' state law claims against the Company defendants are preempted by the RLA under the doctrine of *Garmon* preemption, and the exceptions to *Garmon* do not apply. Seniority benefits are contractual rights protected by federal labor law, not conduct touching interests "deeply rooted in local feeling and responsibility." *See Bensel,* 387 F.3d at 321–22. Similarly, the process of collective negotiation of these contractual rights is central to the RLA. Far from being of only "peripheral concern" to federal labor law, plaintiffs' state law claims strike at the core of conduct and relationships governed by the federal statute. *See id.*

*Bensel v. Allied Pilots Association* involves a parallel law suit brought by former TWA pilots concerning their seniority integration at American. Plaintiff pilots in that case brought claims similar to plaintiffs' claims in this case, alleging failure to bargain under the RLA, state common law claims, and several duty of fair representation claims under the RLA. Applying principles of *Garmon* preemption, the Third Circuit found that the RLA preempted plaintiffs' state law claims, all of which "involve[d] alleged interference with their employment rights as established by the various agreements that govern their wages and other benefits." *Bensel,* 387 F.3d at 321. In finding that the claims were preempted, the Third Circuit held,

Clearly, the process of seniority integration in the event of an acquisition directly affects the wages and other benefits of workers. The RLA determines the rights, obligations, and duties of employees, their representatives, and carriers with respect to negotiations and agreements concerning such a central aspect of employment. Thus, federal law is directly concerned with the issues here.

*Id.* at 321–22.

Similarly, in *Pyles v. United Air Lines, Inc.,* the Eleventh Circuit found RLA preemption applicable in the context of an airline merger. Pyles was a former Pan Am pilot who was denied a transfer to United Air Lines following the merger of the two airlines. In rejecting Pyles' argument that the RLA was not applicable to his claim because he was never an employee of United, the Court noted that "[m]ergers are becoming an increasingly common phenomenon in the airline industry; as they increase, so will the need for uniformity in the treatment given to those for whom a transfer is negotiated." *Pyles,* 79 F.3d at 1051. Pyles' position with respect to United was not that of "a mere applicant ... off the street." Rather, his position at Pan Am and his affiliation with the Pan Am pilots' union "put him in a position to be considered before other potential job applicants." *Id.* Thus, his dispute was governed by the RLA.

Here, as in *Bensel* and *Pyles,* the state law claims against the Company defendants arising during the pre-hire period are preempted by the RLA.

■ Turning to the state law claims against APFA, I conclude that they are preempted by the federal duty of fair representation. A union, as the exclusive bargaining representative of the employees it represents, owes the employees a duty to represent them fairly in collective bargaining with the employer and in enforcing the resulting CBA. *See Steele v. Louisville & Nashville R.R. Co.,* 323 U.S. 192, 201–02, 65 S.Ct. 226, 89 L.Ed. 173 (1944); *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). This duty, although not an explicit statutory requirement, has been fashioned judicially as a corollary to "the exclusive agent's statutory authority to represent all members of a designated unit" and requires the union "to serve the interests of all members without hostility or discrimination to ward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *See Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 74–77, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); *Vaca,* 386 U.S. at 177, 87 S.Ct. 903.

■ "The scope of the duty of fair representation is commensurate with the scope of the union's statutory authority as the exclusive bargaining agent." *Bensel,* at 312. Thus, a union does not owe a duty of fair representation to those it does not represent. *See McNamara–Blad v. Ass'n of Prof'l Flight Attendants,* 275 F.3d 1165, 1169–70 (9th Cir.2002). In this case, there is no dispute that APFA did not owe plaintiffs a duty of fair representation under the RLA before it was certified as their representative on April 19, 2002. *See id.* at 1170.[7]

■ Because federal labor law defines the scope of the duty of fair representation a union owes to its members, state law claims that are "mere refinements" of the duty of fair representation

**7.** The Amended Complaint had contained a ninth count, which alleged that APFA breached its duty of fair representation under the RLA by entering into the Seniority Integration Agreement. Plaintiffs have voluntarily dismissed Count Nine with prejudice.

are preempted. *See Nellis v. Air Line Pilots Ass'n,* 805 F.Supp. 355, 360 (E.D.Va. 1992), *aff'd by & reasoning adopted by Nellis v. Air Line Pilots Ass'n,* 15 F.3d 50, 51 (4th Cir.1994); *see also Bensel,* 387 F.3d at 321–22; *May v. Shuttle, Inc.,* 129 F.3d 165, 179 (D.C.Cir.1997); *Peterson,* 759 F.2d at 1170. A claim is a "mere refinement" of the duty of fair representation if it is based on the same conduct that would support a federal duty of fair representation claim or it if seeks to vindicate the same rights as the federal duty of fair representation. *Nellis,* 805 F.Supp. at 360; *see also Peterson,* 759 F.2d at 1170. The federal interest in the duty of fair representation is of such importance that a duty of fair representation claim is governed exclusively by federal law even when brought in state court. *Vaca,* 386 U.S. at 178, 87 S.Ct. 903; *Peterson,* 759 F.2d at 1169–70.

Plaintiffs' state claims against APFA seek to vindicate the same rights as are protected by the federal duty of fair representation. They challenge APFA's conduct in negotiating the integration agreements—in essence, alleging that APFA's conduct was dishonest and in bad faith. They therefore are preempted. *See Bensel,* 387 F.3d at 321–22; *Nellis,* 805 F.Supp. at 360; *May,* 129 F.3d at 179; *Peterson,* 759 F.2d at 1170. "The rights and duties of unions in carrying out their representational functions is an area where 'the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law.'" *Bensel,* 387 F.3d at 321–22 (citations omitted). Allowing state law claims in this area would disrupt the federal scheme.

This case, like *Bensel,* squarely presents the issue whether the preemption of state claims can arise during the period that there is no federal duty of fair representation because plaintiffs were not yet represented by the defendant union. I agree with the Third Circuit that "[t]he importance of uniform relations among employees, unions, and employers may call for preemption of state protections of federal rights, even where federal law does not impose an analogous duty." *Bensel,* 387 F.3d at 322. Thus, the state law claims against APFA relating to its negotiation of agreements relating to working conditions and seniority are preempted even though APFA owed no duty of fair representation to plaintiffs during the integration process. If the duty of fair representation is inapplicable, plaintiffs cannot avoid that result by simply using state common law labels for their claims. Put another way, plaintiffs cannot substitute for an inadequate duty of fair representation claim a state law claim arising out of the same facts and theories of obligation or "mere refinements" of those theories.

### Lack of Jurisdiction Over Minor Disputes

■ In addition, insofar as plaintiffs' state law claims against both the Company defendants and APFA are premised on breaches of agreements arising under the RLA, the court lacks jurisdiction because those claims are minor disputes under the RLA and are within the exclusive jurisdiction of the Adjustment Board. *See* 45 U.S.C. § 184; *Hawaiian Airlines,* 512 U.S. at 253, 114 S.Ct. 2239. The Transition Agreement is a collectively bargained agreement between IAM and TWA–LLC. The Seniority Integration Agreement is a collectively bargained agreement between American and APFA. Both are subject to the provisions of the RLA. Indeed, each agreement recites that it "is made and entered into in accordance with the provisions of the Railway Labor Act." Plaintiffs'

state law claims relating to these agreements would require interpretation of their terms; thus, this court lacks subject matter jurisdiction to hear them. *See Hawaiian Airlines,* 512 U.S. at 253, 114 S.Ct. 2239. Indeed, not only would adjudication of these claims require interpretation of collectively bargained agreements, but the relief plaintiffs seek in their state law claims would require the court in effect to change the terms of these agreements to reinstate the seniority benefits plaintiffs lost as a consequence of the Seniority Integration Agreement. This court lacks jurisdiction to provide such relief.

Plaintiffs argue their state law claims fall within the exception described in *Hawaiian Airlines,* which provides that the RLA does not preempt state claims that seek to enforce rights independent of a CBA and do not require interpretation of its terms. *Hawaiian Airlines* involved a wrongful discharge suit brought by an individual employee under state tort law and under the Hawaii Whistleblower Protection Act. The Supreme Court held that "a state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA." *Hawaiian Airlines,* 512 U.S. at 260, 114 S.Ct. 2239. The Court concluded that the employee's state law suit was not preempted because the only source of the asserted rights was state law, not the CBA, and, although the state law claims might include attention to the same facts as a claim under the CBA, the state claims did not require interpretation of the CBA itself and therefore were not "minor disputes" under the RLA. *See Hawaiian Airlines,* 512 U.S. at 262–63, 114 S.Ct. 2239. Here, however, plaintiffs' state law claims are aimed at conduct governed by the RLA and seek to protect their contractual rights negotiated under the authority of the RLA. Plaintiffs cannot point to a state law source of rights independent of these collectively bargained agreements.

## CONCLUSION

The Amended Complaint is dismissed in its entirety.

**SO ORDERED.**